# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **SIMPLY WHEELZ LLC, D/B/A** | ) | **CASE NO. 13-03332-ee** |
| **ADVANTAGE RENT-A-CAR** | ) | **Chapter 11** |
| | ) | |
| **Debtor** | ) | |
| | ) | |

**AMENDED EMERGENCY MOTION OF DEBTOR FOR PRELIMINARY AND FINAL
ORDER (A) AUTHORIZING POST-PETITION FINANCING ON A SECURED AND
SUPER-PRIORITY BASIS PURSUANT TO 11 U.S.C. §§ 105, 364(C)(1), 364(C)(2),
364(C)(3) AND 507(B); (B) GRANTING OTHER RELATED RELIEF; AND
(C) SCHEDULING A FINAL HEARING PURSUANT TO RULE 4001(C)(2)**

COMES NOW Simply Wheelz LLC as debtor and debtor-in-possession (the "Debtor"),

through its counsel, and files this *Emergency Motion for a Preliminary and Final Order*

*(A) Authorizing Post-petition Financing on a Secured and Super Priority Basis Pursuant to 11*

*U.S.C. §§ 105, 364(c)(1), 364(c)(2), 364(c)(3), and 507(b); (B) Granting Other Related Relief;*

*and (C) Scheduling a Final Hearing Pursuant to Rule 4001(c)(2)* (the "Motion") in which the

Debtor requests immediate relief authorizing post-petition financing in the amount of $14.8

million (the "Interim Funding") through the entry of an interim order in substantially similar

form to that filed herewith (the "Interim Order") (a copy of which is attached hereto as

**Exhibit A**), and then, after notice and a final hearing, a final order authorizing post-petition

financing in the amount of $36 million (the "Funding"). In support of this Motion, the Debtor

respectfully states as follows:

## I.    JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (M).

2.    The statutory bases for the relief requested herein are Sections 361, 363, 364 and 542 of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II.    BACKGROUND

3.    On November 5, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief, and thereby commenced a case under chapter 11, title 11, of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Mississippi (the "Court").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is operating its business and managing its property as debtor-in-possession.

4.    No trustee or examiner has been appointed, and no official committee of creditors or equity interest holders has yet been established.

5.    The Debtor is a Delaware limited liability company doing business under the brand name Advantage Rent A Car ("Advantage"). The Debtor provides retail rental car services for leisure, lifestyle, business and insurance replacement customers and maintains a fleet of approximately 23,000 vehicles in 73 locations throughout the United States.  The Debtor is the fourth largest retail rental car provider in North America and employs approximately 1,800 employees and outside contractors.  The Debtor's principal place of business is located at 1052 Highland Colony Parkway, Suite 204, Ridgeland, Mississippi.

6.      Additional information about the Debtor's business and the events leading up to the Petition Date can be found in the Declaration of Thomas P. McDonnell, III in support of the Chapter 11 Petition and the first day motions (the "McDonnell Declaration") which is incorporated herein by reference.

7.      The Debtor seeks interim and final approval to obtain post-petition financing in the form of a post-petition multiple draw term loan credit facility provided by The Catalyst Capital Group, Inc., on behalf of one or more funds managed by it and/or through certain affiliates (the "DIP Lender"), pursuant to and in accordance with that certain binding "DIP Facility Term Sheet" attached as **Exhibit B** hereto (as may be hereafter amended in accordance with the Interim Order, the "DIP Term Sheet"), or, to the extent required by the DIP Lender in accordance with the Interim Order, a definitive credit agreement governing the DIP Facility that incorporates the terms and conditions set forth in the DIP Term Sheet and is otherwise in form and substance acceptable to the DIP Lender (the "DIP Credit Agreement"), whichever is in full force and effect at any given time (the binding agreement governing such credit facility as between the DIP Term Sheet and the DIP Credit Agreement shall be referred to herein as the "Governing DIP Agreement")[1] (such credit facility, the "DIP Facility").   Additional terms of the DIP Facility are set forth in the Interim Order.

8.      The Debtor also seeks the following relief:

A.      Authorization for the Debtor to enter into and perform under: (a) the Governing DIP Agreement; (b) the Interim Order; and (c) all other security agreements, pledge agreements, notes, guarantees, mortgages, certificates, Uniform Commercial Code financing statements and all other related agreements, instruments and other documents

---

[1] Capitalized terms used but not otherwise defined in the Interim Order shall have the respective meanings ascribed to such terms in the Governing DIP Agreement.

executed and/or delivered in connection with, or otherwise related to, the DIP Facility (as defined below), each of which being in form and substance acceptable to the DIP Lender (all such documents referred to in this clause (c), together with the Governing DIP Agreement and the Interim Order, collectively, the "DIP Loan Documents");

B.      Authorization for the Debtor to grant to the DIP Lender, subject solely to the Carve-Out (as defined below): (a) the DIP Liens on all of the Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, which DIP Liens (as defined below) shall be junior only to any Permitted Prior Liens (as defined below), and (b) super-priority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code having recourse to all pre-petition and post-petition property of the Debtor's estate, now owned or hereafter acquired, and any of the Debtor's rights under section 506(c) of the Bankruptcy Code (solely to the extent of such section 506(c) rights, subject to entry of the Final Order (as defined below)) and the proceeds thereof;

C.      To vacate the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and subject in all respects to the Debtor's rights under paragraph 11 hereof;

D.      Authorization for the Debtor to borrow up to $14.8 million (the "Interim Amount") during the Interim Period (as defined below) under the DIP Facility for the purposes of funding the operations of the Debtor's businesses, paying certain transaction fees and expenses and other costs and expenses of administration of the Case, all subject to, and in accordance with, the DIP Loan Documents and the Approved Budget (as defined below);

E.    The scheduling of a final hearing (the "Final Hearing") to be held before this Court to consider entry of a final order, the form and substance of which shall be acceptable to the DIP Lender, approving the DIP Facility (as defined below) in an aggregate principal amount not to exceed $36,000,000 (the "Commitment") (which Commitment may be increased without further order of this Court by up to $10,000,000 upon written agreement of the Debtor and the DIP Lender in their respective sole discretion) on a final basis (the "Final Order"), to be used by the Debtor for the purpose of funding the operations of the Debtor's businesses, paying other costs and expenses of administration of the Case in accordance with the DIP Loan Documents, the Final Order and the Approved Budget; and

F.    Waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of the Interim Order.

9.    Under Bankruptcy Rule 4001(c)(2), the Court may commence a final hearing on a motion for authority to obtain credit no earlier than fourteen (14) days after service of the motion and notice of hearing on the motion. Bankruptcy Rule 4001(c)(2) further provides, however, that the Court may conduct a preliminary hearing before the expiration of the 14-day notice period as necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. Debtor respectfully requests the Court to conduct a preliminary hearing at the Court's earliest convenience to authorize the secured post-petition financing as necessary to avoid immediate and irreparable harm to Debtor's bankruptcy estate pending a final hearing.

10.    Debtor's Need for Financing.  The Debtor has an immediate need for financing under the DIP Facility pursuant to the terms of the DIP Term Sheet. The DIP Facility will allow the Debtor, among other things, to maintain the orderly continuation of the operation of its

businesses; to maintain business relationships with vendors, suppliers and customers; to make payroll; to make capital expenditures and satisfy other working capital and operational needs; and, most importantly, to facilitate the sale of the Debtor's business as a going concern. The Debtor's access to sufficient working capital and liquidity through borrowings under the DIP Facility is vital to maximizing the value of the Debtor's assets and businesses for the benefit of the Debtor's creditors and other parties in interest. Most significantly, the DIP Lender is providing the DIP Facility to provide the Debtor sufficient liquidity to pursue a going concern sale process over an approximate 60 day period, and the DIP Lender is willing to serve as a stalking horse bidder. Attached to this Motion as **Exhibit C** is a 363 Sale Term Sheet summarizing the terms of the proposed stalking horse bid of the DIP Lender. That term sheet lays out various sale process milestones for achieving a closing by January 3. While the Debtor is not seeking approval of this sale process (or the 363 Sale Term Sheet), the terms of the DIP Facility does incorporate the sale process time line set forth in that term sheet, and the Debtor's failure to meet any of those milestones will constitute Events of Default under the DIP Facility.

11.     <u>No Credit Available on More Favorable Terms</u>. As set forth in the Motion and in the McDonnell Declaration, the Debtor has been, and continues to be, unable to obtain financing on more favorable terms from sources other than the DIP Facility from the DIP Lender pursuant to the DIP Loan Documents. The Debtor is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor is also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, other than on an interim basis as provided in the Interim Order and subject to the granting to the DIP Lender of the rights, remedies, privileges, benefits and protections provided herein and in the DIP Loan Documents (collectively, the "<u>DIP</u>

Protections"), including, without limitation, the DIP Liens and the DIP Super-Priority Claims (each as defined below).

12.      <u>Business Judgment and Good Faith Pursuant to Section 364(e).</u>

A.      The DIP Lender has indicated a willingness to provide the Debtor post-petition secured financing pursuant to the DIP Facility in accordance with the DIP Loan Documents.

B.      The terms and conditions of the DIP Facility pursuant to the DIP Loan Documents, and the fees and expenses paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

C.      The DIP Facility and DIP Loan Documents were negotiated in good faith and at arm's length among the Debtor and the DIP Lender with the assistance and counsel of their respective advisors, and all of the DIP Obligations (as defined below) shall be deemed to have been extended by the DIP Lender and its affiliates for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Liens, the DIP Super-Priority Claims and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event the Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended or modified, on appeal or otherwise.

13.      <u>Relief Essential; Best Interest.</u>  For the reasons stated above, the Debtor requests immediate entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2) and

the Local Rules because in the absence of the Court's granting the relief requested herein, the Debtor's businesses, assets and estate will be immediately and irreparably harmed. Consummation of the DIP Facility in accordance with the Interim Order and the other DIP Loan Documents is therefore in the best interests of the Debtor's estate and consistent with its fiduciary duties.

14.    <u>DIP Loan Documents and DIP Protections</u>.  The Debtor seeks:

A.    <u>Authorization to Enter into the DIP Credit Agreement and to Obtain Financing</u>.  The Debtor requests that it be expressly and immediately authorized to execute, deliver and perform under the DIP Loan Documents and to incur the DIP Obligations (as defined below) in accordance with, and subject to, the terms of the Interim Order and the other DIP Loan Documents, and to execute, deliver and perform under all other instruments, certificates, agreements and documents which may be required or necessary for the performance by the Debtor under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for by, the Interim Order and the other DIP Loan Documents.

B.    <u>DIP Obligations</u>.  For purposes of this Motion, the term "<u>DIP Obligations</u>" means all amounts and other obligations and liabilities owing or arising under the DIP Loan Documents (including, without limitation, all "DIP Obligations," as defined in the DIP Term Sheet) and includes, without limitation, the principal of, interest on and fees, costs, expenses and other charges owing in respect of, such amounts (including any reasonable attorneys', accountants', financial advisors' and other fees, costs and expenses), and any obligations in respect of indemnity and reimbursement claims, whether contingent or otherwise.

C.    <u>Authorization to Incur DIP Obligations</u>.  To enable the Debtor to continue

to operate its businesses, during the period from the granting of an Interim Order through

and including the earliest of thirty (30) days after the Commencement Date and the entry

of the Final Order (such period, the "<u>Interim Period</u>"), to authorize the Debtor to borrow

under the DIP Facility during such Interim Period in an aggregate outstanding principal

amount not to exceed $36 million, in each case subject to the terms and conditions of the

Interim Order and the other DIP Loan Documents.

D.    <u>Guaranties</u>.  To require that, as a condition of the DIP Lender entering into

the DIP Facility, all DIP Obligations of the Debtor under the DIP Facility be

unconditionally guaranteed by the Debtor's non-Debtor parent company, Franchise

Services of North America, Inc.

E.    <u>Use of Cash Collateral</u>.  Following the expiration of the Interim Period, to

require that the Debtor's authority to request and/or obtain further borrowings or other

financial accommodations under the DIP Facility and to use "cash collateral," as defined

in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>") be governed by the terms of

the Final Order (if entered) and the DIP Loan Documents.

F.    <u>Approved Budget</u>.  The Debtor has prepared a ten-week cash flow budget

of the Debtor which is in form and substance satisfactory to the DIP Lender (but which

may be amended or otherwise modified by agreement of the Debtor and the DIP Lender

in accordance with the Interim Order, the "<u>Approved Budget</u>"), a copy of which is

attached hereto as **Exhibit D**.  The Approved Budget reflects, on a line-item basis for

such ten-week period, the Debtor's projected cash receipts and disbursements (including

ordinary course operating expenses, bankruptcy-related expenses incurred in connection

with the Case, capital expenditures and estimated fees, costs and expenses of the DIP

Lender and its affiliates as provided in the DIP Loan Documents (including fees, costs

and expenses of counsel, financial advisors and other professionals therefor)), and

unrestricted cash on hand.  On Tuesday of each week (by 12:00 noon prevailing Central

Time), the Debtor shall provide to the DIP Lender a variance report in form acceptable to

the DIP Lender (each, a "Variance Report") with respect to the immediately prior week

ended Friday, setting forth (i) the actual cash receipts and disbursements for such

immediately preceding week on a line-item basis and available cash on hand as of the end

of such week, (ii) the variance in dollar amounts of the actual receipts and disbursements

for each weekly period from those reflected for the corresponding period in the Approved

Budget, and (iii) a description of the nature of any positive or negative variance of greater

than five percent (5%) in any line item for each weekly period from what is reflected in

the corresponding line item for the corresponding period in the Approved Budget.

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully requests that the

Court enter an order granting it the following relief:

1.        Authorizing the Debtor to enter into and perform under the DIP Loan Documents;

2.        Authorizing for the Debtor to grant to the DIP Lender, subject solely to the Carve-

Out (as defined below): (a) the DIP Liens on all of the Collateral pursuant to sections 364(c)(2),

364(c)(3) and 364(d)(1) of the Bankruptcy Code, which DIP Liens shall be junior only to any

Permitted Prior Liens and (b) super-priority administrative claims pursuant to section 364(c)(1)

of the Bankruptcy Code having recourse to all pre-petition and post-petition property of the

Debtor's estate, now owned or hereafter acquired, and any of the Debtor's rights under section

506(c) of the Bankruptcy Code;

3. To vacate the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents;

4. Authorizing the Debtor to borrow up to $14.8 million as the Interim Amount during the Interim Period under the DIP Facility for the purposes of funding the operations of the Debtor's businesses, paying certain transaction fees and expenses and other costs and expenses of administration of the Case, all subject to, and in accordance with, the DIP Loan Documents and the Approved Budget;

5. Scheduling a Final Hearing to be held before this Court to consider entry of a final order, the form and substance of which shall be acceptable to the DIP Lender, approving the DIP Facility in an aggregate principal amount not to exceed $36,000,000, which Commitment may be increased without further order of this Court by up to $10,000,000 upon written agreement of the Debtor and the DIP Lender in their respective sole discretion, on a final basis in a Final Order, to be used by the Debtor for the purpose of funding the operations of the Debtor's businesses, paying other costs and expenses of administration of the Case in accordance with the DIP Loan Documents, the Final Order and the Approved Budget;

6. Finding the Debtor and the DIP Lender have acted in good faith and are protected by the provisions of Section 364(e) of the Bankruptcy Code;

7. Waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of the Interim Order and the Final Order; and

8. Granting such other, further and different relief as may be just and proper.

THIS, the 6th day of November, 2013.

Respectfully submitted,

SIMPLY WHEELZ, LLC

By: _s/ Stephen W. Rosenblatt_
Stephen W. Rosenblatt (MB # 5676)
Christopher R. Maddux (MB # 100501)
J. Mitchell Carrington (MB # 104228)
Thomas M. Hewitt (MB # 104589)
BUTLER SNOW LLP
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
Telephone: (601) 985-4504
Fax: (601) 985-4500
Steve.Rosenblatt@butlersnow.com
Chris.Maddux@butlersnow.com
Mitch.Carrington@butlersnow.com

ATTORNEYS FOR DEBTOR

## CERTIFICATE OF SERVICE

I certify that the foregoing pleading was filed electronically through the Court's ECF

system and served electronically on all parties enlisted to receive service electronically and was

separately served by e-mail on the following:

Ronald H. McAlpin, Esq.
Assistant United States Trustee
501 East Court Street
Suite 6-430
Jackson, MS 39201
Ronald.McAlpin@USDOJ.gov

Office of the United States Trustee
501 East Court Street
Suite 6-430
Jackson, MS 39201
USTPRegion05.AB.ECF@usdoj.gov

SO CERTIFIED, this the 6th day of November, 2013.


_s/ Stephen W. Rosenblatt_____
STEPHEN W. ROSENBLATT


ButlerSnow 18284077v1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

In re:                                              )
                                                    )
**SIMPLY WHEELZ LLC, D/B/A**                        )          **CASE NO. 13-03332-ee**
**ADVANTAGE RENT-A-CAR**                            )          **Chapter 11**
                                                    )
     **Debtor**            )
_____ )

## INTERIM ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364; (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Simply Wheelz LLC (the "*Borrower*"), as a debtor and debtor-in-possession (the "*Debtor*") in the above captioned chapter 11 case (the "*Case*," and upon conversion to a case under chapter 7 of the Bankruptcy Code (as defined below) and any other proceedings related to the Case, a "*Successor Case*"), having filed a motion, dated November 6, 2013 (the "*Motion*"), requesting entry of an interim order (together with all exhibits attached hereto, this "*Interim Order*") pursuant to sections 105, 361, 362, 363, 364, and 507 of chapter 11 of title 11 of the United States Code (as amended, the "*Bankruptcy Code*"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), and the Local Bankruptcy Rules for the Southern District of Mississippi (the "*Local Rules*") seeking, among other things:

     (i)     authorization for the Borrower to establish the post-petition multiple draw term loan credit facility provided by The Catalyst Capital Group, Inc., on behalf of one or more funds managed by it and/or through certain affiliates (the "*DIP Lender*"), pursuant to and in accordance with that certain binding "DIP Facility Term Sheet" attached as <u>Exhibit A</u> hereto (as may be hereafter amended in accordance with this Interim Order, the "*DIP Term Sheet*"), or, to



EXHIBIT
" A "

the extent required by the DIP Lender in accordance with this Interim Order, a definitive credit agreement governing the DIP Facility that incorporates the terms and conditions set forth in the DIP Term Sheet and is otherwise in form and substance acceptable to the DIP Lender (the "***DIP Credit Agreement***"), whichever is in full force and effect at any given time (the binding agreement governing such credit facility as between the DIP Term Sheet and the DIP Credit Agreement shall be referred to herein as the "***Governing DIP Agreement***")[1] (such credit facility, the "***DIP Facility***");

(ii)    authorization for the Debtor to enter into and perform under: (a) the Governing DIP Agreement; (b) this Interim Order; and (c) all other security agreements, pledge agreements, notes, guarantees, mortgages, certificates, Uniform Commercial Code financing statements and all other related agreements, instruments and other documents executed and/or delivered in connection with, or otherwise related to, the DIP Facility (as defined below), each of which being in form and substance acceptable to the DIP Lender (all such documents referred to in this clause (c), together with the Governing DIP Agreement and this Interim Order, collectively, the "***DIP Loan Documents***");

(iii)    the granting to the DIP Lender, subject solely to the Carve-Out (as defined below): (a) the DIP Liens on all of the Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, which DIP Liens (as defined below) shall be junior only to any Permitted Prior Liens (as defined below), and (b) super-priority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code having recourse to all pre-petition and post-petition property of the Debtor's estate, now owned or hereafter

---

[1] Capitalized terms used but not otherwise defined in this Interim Order shall have the respective meanings ascribed to such terms in the Governing DIP Agreement.

2

acquired, and any of the Debtor's rights under section 506(c) of the Bankruptcy Code and the proceeds thereof;

(iv)    to vacate the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and subject in all respects to the Debtor's rights under paragraph 11 hereof;

(v)    authorization for the Debtor to borrow up to $38,000,000, plus "Deposits" (as defined in the Approved Budget) to be funded during the Interim Period (as defined below) (collectively, the "*Interim Amount*") during the Interim Period (as defined below) under the DIP Facility for the purposes of funding the operations of the Debtor's businesses, paying certain transaction fees and expenses and other costs and expenses of administration of the Case, all subject to, and in accordance with, the DIP Loan Documents and the Approved Budget (as defined below);

(vi)    the scheduling of a final hearing (the "*Final Hearing*") to be held before this Court to consider entry of a final order, the form and substance of which shall be acceptable to the DIP Lender, approving the DIP Facility (as defined below) in an aggregate principal amount not to exceed $36,000,000 (which Commitment may be increased without further order of this Court by up to $10,000,000 upon written agreement of the Debtor and the DIP Lender in their respective sole discretion) (the "*Commitment*") on a final basis (the "*Final Order*"), to be used by the Debtor for the purpose of funding the operations of the Debtor's businesses, paying other costs and expenses of administration of the Case in accordance with the DIP Loan Documents, the Final Order and the Approved Budget; and

CH\1692398.10

(vii)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order.

Having considered the Motion, the DIP Term Sheet, the Declaration of Thomas P. McDonnell III (the "***First Day Declaration***"), and the evidence submitted or proffered at the hearing held and concluded before this Court on November 7, 2013 (the "***Interim Hearing***"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d) and 9014 and all applicable Local Rules, notice of the Motion and the Interim Hearing having been provided in a sufficient manner; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtor pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtor, its creditors, its estate and all parties in interest, and is essential for maximizing the value of the Debtor's businesses and assets for the benefit of the Debtor's creditors and all parties in interests; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS FOUND, ORDERED AND ADJUDGED[2], that:**

A.    **Commencement Date**. On November 5, 2013 (the "***Commencement Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Mississippi (this "***Court***"). The Debtor has continued in the management and operation of its business and properties as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, or examiner has been appointed in the Case and no official committee of creditors has yet been appointed in the Case.

---

[2]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

B.    **Jurisdiction and Venue**.  This Court has core jurisdiction over the Case, the

Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

Venue for the Case and proceedings on the Motion is proper before this Court pursuant to 28

U.S.C. §§ 1408.  The statutory predicates for the relief sought herein are sections 105, 361, 362,

363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014 and

Local Rule 4001-5.

C.    **Notice**.  The Interim Hearing is being held pursuant to the authorization of

Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the

Motion has been provided by the Debtor, whether by facsimile, electronic mail, overnight courier

or hand delivery, on November 6, 2013, to certain parties in interest, including: (a) the United

States Trustee for Region; (b) [          ]; (c) [     ] (d) Latham & Watkins LLP and Watkins &

Eager, PLLC, as counsel to the DIP Lender; (e) the United States Attorney for the Southern

District of Mississippi; (f) the Internal Revenue Service; (g) the Securities and Exchange

Commission, (h) Bank of America, N.A., and (i) the Debtor's 20 largest unsecured creditors.

Under the circumstances, such notice of the Motion, the relief requested therein and the Interim

Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules.

D.    **Findings Regarding the DIP Facility**.

(i)    Need for Post-Petition Financing.  The Debtor has an immediate need to

obtain loans under the DIP Facility to, among other things, permit the orderly continuation of the

operation of its businesses, to maintain business relationships with vendors, suppliers and

customers, to make payroll, to make capital expenditures, and to satisfy other working capital

and operational needs, and to facilitate the going concern sale of the Debtor's business.  The

Debtor's access to sufficient working capital and liquidity through borrowings under the DIP

CH\1692398.10

Facility is vital to maximizing the value of the Debtor's assets and businesses for the benefit of the Debtor's creditors and parties in interest.

(ii)     No Credit Available on More Favorable Terms.  As set forth in the Motion and in the First Day Declaration, the Debtor has been, and continues to be, unable to obtain financing on more favorable terms from sources other than the DIP Facility from the DIP Lender pursuant to the DIP Loan Documents.  The Debtor is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtor is also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), 364(c)(3) or 364(d)(1) of the Bankruptcy Code, other than on an interim basis as provided in this Interim Order and subject to the granting to the DIP Lender of the rights, remedies, privileges, benefits and protections provided herein and in the DIP Loan Documents (collectively, the "***DIP Protections***"), including, without limitation, the DIP Liens and the DIP Super-Priority Claims (each as defined below).

E.     **Business Judgment and Good Faith Pursuant to Section 364(e).**

(i)     The DIP Lender has indicated a willingness to provide the Debtor post-petition secured financing pursuant to the DIP Facility in accordance with the DIP Loan Documents.

(ii)     The terms and conditions of the DIP Facility pursuant to the DIP Loan Documents, and the fees and expenses paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

6

(iii)    The DIP Facility and DIP Loan Documents were negotiated in good faith and at arm's length among the Debtor and the DIP Lender with the assistance and counsel of their respective advisors, and all of the DIP Obligations (as defined below) shall be deemed to have been extended by the DIP Lender and its affiliates for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Liens, the DIP Super-Priority Claims and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended or modified, on appeal or otherwise.

F.    **Relief Essential; Best Interest**.  For the reasons stated above, the Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2) and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtor's businesses, assets and estate will be immediately and irreparably harmed.  Consummation of the DIP Facility in accordance with this Interim Order and the other DIP Loan Documents is therefore in the best interests of the Debtor's estate and consistent with its fiduciary duties.

**NOW, THEREFORE**, on the Motion and the record before this Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.    **Motion Granted**.  The Motion is granted in accordance with the terms and conditions set forth in this Interim Order and the other DIP Loan Documents.  This Interim Order shall become effective immediately upon its entry.  Any objections to the Motion with respect to

7

the entry of this Interim Order that have not been withdrawn, waived or settled, are denied and overruled with prejudice.

2.     **DIP Loan Documents and DIP Protections**.

(a)     Approval of DIP Loan Documents.     The Debtor is expressly and immediately authorized to execute, deliver and perform under the DIP Loan Documents and to incur the DIP Obligations (as defined below) in accordance with, and subject to, the terms of this Interim Order and the other DIP Loan Documents, and to execute, deliver and perform under all other instruments, certificates, agreements and documents which may be required or necessary for the performance by the Debtor under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for by, this Interim Order and the other DIP Loan Documents. The Debtor is hereby authorized to do and perform all acts and pay the principal, interest, fees, expenses and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents, including all closing fees, administrative fees, commitment fees and reasonable attorneys', financial advisors', and accountants' fees, costs and expenses, and disbursements arising under the DIP Loan Documents, which amounts shall not be subject to further approval of this Court and shall be non-refundable; provided, however, that the payment of the fees and expenses of the DIP Lender Professionals (as defined below) incurred on or after the Commencement Date shall be subject to the provisions of paragraph 14(a). Upon their execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtor enforceable against the Debtor in accordance with their terms. Each responsible officer of the Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive of their respective authority to act in the name of and on behalf of the Debtor.

8

(b)    DIP Obligations.   For purposes of this Interim Order, the term "**DIP Obligations**" shall mean all amounts and other obligations and liabilities owing or arising under the DIP Loan Documents (including, without limitation, all "DIP Obligations," as defined in the DIP Term Sheet) and shall include, without limitation, the principal of, interest on and fees, costs, expenses and other charges owing in respect of, such amounts (including any reasonable attorneys', accountants', financial advisors' and other fees, costs and expenses), and any obligations in respect of indemnity and reimbursement claims, whether contingent or otherwise.

(c)    Authorization to Incur DIP Obligations.   To enable the Debtor to continue to operate its businesses, during the period from the entry of this Interim Order through and including the earliest of thirty (30) days after the Commencement Date and the entry of the Final Order (such period, the "**Interim Period**"), the Debtor is hereby authorized to borrow under the DIP Facility during such Interim Period in an aggregate outstanding principal amount not to exceed $_____, in each case subject to the terms and conditions of this Interim Order and the other DIP Loan Documents.   All DIP Obligations shall be unconditionally guaranteed by the Debtor's non-Debtor parent company, Franchise Services of North America, Inc. to the extent provided in the Governing DIP Agreement.   Following the expiration of the Interim Period, the Debtor's authority to request and/or obtain further borrowings or other financial accommodations under the DIP Facility and to use "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**") will be governed by the terms of the Final Order (if entered) and the DIP Loan Documents.

(d)    Approved Budget.   Attached hereto as Exhibit B is a ten-week cash flow budget in form and substance satisfactory to the DIP Lender (as may be amended or otherwise modified by agreement of the Debtor and the DIP Lender in accordance with this Interim Order,

9

the "*Approved Budget*") that reflects, on a line-item basis for such ten-week period, the Debtor's projected cash receipts and disbursements (including ordinary course operating expenses, bankruptcy-related expenses incurred in connection with the Case, capital expenditures and estimated fees, costs and expenses of the DIP Lender and its affiliates as provided in the DIP Loan Documents (including fees, costs and expenses of counsel, financial advisors and other professionals therefor)), and unrestricted cash on hand.  On [Tuesday] of each week (by 12:00 noon prevailing Central Time), the Debtor shall provide to the DIP Lender a variance report in form acceptable to the DIP Lender (each, a "*Variance Report*") with respect to the immediately prior week ended [Friday], setting forth (i) the actual cash receipts and disbursements for such immediately preceding week on a line-item basis and available cash on hand as of the end of such week, (ii) the variance in dollar amounts of the actual receipts and disbursements for each weekly period from those reflected for the corresponding period in the Approved Budget, (iii) a description of the nature of any positive or negative variance of greater than five percent (5%) in any line item for each weekly period from what is reflected in the corresponding line item for the corresponding period in the Approved Budget, and (iv) whether the Debtor coupled with each of the budget covenants set forth in subsection (e) below for the applicable testing period.

(e)      Budget Covenants.

(i)      **Weekly Disbursement Test**.  Commencing on November [30], 2013, and tested each [Friday] thereafter (each a "*Weekly Disbursement Testing Date*"), the Debtor's actual aggregate disbursements for the four-week period ending on each such Weekly Disbursement Testing Date (calculated in the same manner as the Debtor calculated such aggregate disbursements in the Approved Budget) shall not exceed 110% of the sum of the budgeted "Total Bankruptcy & Restructuring Costs," "Total Other Disbursements" and "Total Operating Disbursements" for such four-week period as reflected in the Approved Budget.

(ii)      **Weekly Receipts Test**.  Commencing on November [30], 2013, and tested each [Friday] thereafter (each, a "*Weekly Receipts Testing Date*"), the Debtor's actual aggregate receipts for the four-week period ending on each Weekly Receipts Testing Date (calculated in the same manner as the Debtor calculated

10

such aggregate receipts in the Approved Budget) shall not be less than 90% of the aggregate budgeted ["Total Operating Receipts"] for such four-week period as reflected in the Approved Budget.

(iii)    **Monthly Disbursement Test.**    Commencing on November [30], 2013, and tested at the last day of each month thereafter (each a "***Monthly Disbursement Testing Date***"), the Debtor's actual aggregate disbursements for the cumulative period ending on each such Monthly Disbursement Testing Date (calculated in the same manner as the Debtor calculated such aggregate disbursements in the Approved Budget) shall not exceed 110% of the sum of the budgeted "Total Bankruptcy & Restructuring Costs," "Total Other Disbursements" and "Total Operating Disbursements" for such cumulative period as reflected in the Approved Budget.

(iv)    **Monthly Receipts Test.**    Commencing on November [30], 2013, and tested at the last day of each month thereafter (each, a "***Monthly Receipts Testing Date***"), the Debtor's actual aggregate receipts for the cumulative period ending on each Monthly Receipts Testing Date (calculated in the same manner as the Debtor calculated such aggregate receipts in the Approved Budget) shall not be less than 90% of the aggregate budgeted ["Total Operating Receipts"] for such cumulative period as reflected in the Approved Budget.

(f)    <u>Interest, Fees, Costs and Expenses.</u>    The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, the DIP Loan Documents, in each case without further notice, motion or application to, order of, or hearing before, this Court.  Subject to the provisions of paragraph 14(a) of this Interim Order, as applicable, the Debtor shall pay all fees, costs, expenses (including reasonable legal and other professional fees and expenses of the DIP Lender and its affiliates) and other charges payable under the terms of the DIP Loan Documents without regard to the amounts set forth with respect thereto in the Approved Budget.  All such fees, costs, expenses and disbursements, whether incurred, paid or required to be paid pre-petition or post-petition, are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Lender and/or its professionals as of the Commencement Date for payment of such fees, costs, expenses and disbursements may be, but are not required to be, applied for payment) as contemplated in the DIP Loan Documents, and shall be non-refundable.

11

(g)    Use of DIP Facility Proceeds.  During the Interim Period, the Debtor is authorized to use borrowings under the DIP Facility and Cash Collateral only for the specific purposes set forth in the Approved Budget and only during the weeks contemplated for such purposes in the Approved Budget.  Notwithstanding anything to the contrary set forth herein, the Debtor shall be permitted to disburse "Deposits" (as defined in the Approved Budget) outside the weeks scheduled for such payments under the Approved Budget.   Budgeted disbursements concerning leases and other arrangements with respect to vehicles that are part of the Debtor's fleet will be subject to prior written approval of a "fleet acquisition plan" by the DIP Lender, as further provided in the Governing DIP Agreement.

(h)    Conditions Precedent.  The DIP Lender shall have no obligation to make any DIP Loan during the Interim Period unless and until all of the following conditions precedent to the making of any such DIP Loan under the DIP Loan Documents have been satisfied in full or waived by the DIP Lender:

(i)    During the Interim Period, this Interim Order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the DIP Lender in its sole discretion.

(ii)    The Court shall have entered a cash management order in form and substance acceptable to the DIP Lender in its sole discretion no later than [__] days after the Commencement Date, and such order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the DIP Lender in its sole discretion;

(iii)    The DIP Lender shall have received payments in full of all fees and expense reimbursement then owing pursuant to the terms of the DIP Loan Documents.

(iv)    The Debtor shall have submitted a borrowing request in form and substance acceptable to the DIP Lender specifying the amount to be borrowed under the DIP Facility no later than three business days prior to the proposed borrowing date; provided that any such borrowing request shall be for a minimum of $1,000,000 (and in $100,000 increments if such request is for greater than the minimum amount).

12

(v)     Immediately after giving effect to a proposed DIP Loan, the aggregate amount of all then outstanding DIP Loans shall not exceed the Commitment.

(vi)    No Event of Default has occurred and is continuing or would reasonably be expected to result after giving effect to any requested DIP Loan.

(i)     DIP Liens. Subject to the Carve-Out (as defined below), the DIP Lender is hereby granted, as security for the DIP Obligations, Liens (as defined below) on all of the property of the Debtor (as further described below, the "*DIP Liens*"), now existing or hereinafter acquired, including all Cash Collateral, cash and cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights (including, without limitation, all rights under any airport concession agreement, lease, or similar or related agreement, to which the Debtor is or purports to be party relating to the Debtor's rental car locations (collectively, the "*Concession Agreements*")), properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort claims, all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing (including, for the avoidance of doubt, the Debtor's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or

13

similar state law, and all proceeds of the foregoing (the "*Avoidance Actions*") (all of the

foregoing collateral, collectively, the "*Collateral*"), as follows:

> (i)    First Lien on Unencumbered Property. Pursuant to section 364(c)(2) of
> the Bankruptcy Code, a first priority security interest in and Lien upon all
> unencumbered Collateral;

> (ii)    Liens Junior to Certain Other Liens. Pursuant to section 364(c)(3) of the
> Bankruptcy Code, a security interest in and Lien upon all Collateral that is subject
> and subordinate solely to any valid, prior, perfected and non-avoidable Liens on
> Collateral existing immediately prior to the Commencement Date or perfected on
> or after the Commencement Date pursuant to section 546(b) of the Bankruptcy
> Code, except for any Liens securing the BofA Indebtedness (as defined below)
> (collectively, "*Permitted Prior Liens*" ); and

> (iii)    Priming Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code, a
> first priority priming security interest and Lien upon any Collateral which is
> subject to a Lien securing the indebtedness of the Debtor to Bank of America,
> N.A. or any affiliate thereof under, or in connection with, that certain Loan
> Agreement, dated as of June 7, 2013, between Bank of America, N.A. and Simply
> Wheelz LLC, as amended (the "*BofA Indebtedness*").

> (j)    DIP Lien Priority. Notwithstanding anything to the contrary contained in

this Interim Order or the other DIP Loan Documents, the DIP Liens granted to the DIP Lender

shall in each and every case be first priority senior Liens that (i) are subject and subordinate only

to the Permitted Prior Liens and the Carve-Out, and (ii) are otherwise senior to all pre-petition

and post-petition Liens of any other person or entity. The DIP Liens and the DIP Super-Priority

Claims (as defined below) (A) shall not be subject to sections 510, 549, 550 or 551 of the

Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, any intercompany or

affiliate security interest or Lien, and (C) shall be valid and enforceable against any trustee or

any other estate representative appointed in the Case or in any Successor Case, and/or upon the

dismissal of the Case. Except as otherwise expressly permitted by the DIP Loan Documents, no

claim or Lien having a priority superior to or *pari passu* with those granted by this Interim Order

with respect to the DIP Obligations shall be granted or allowed until (x) all DIP Obligations have

14

been indefeasibly paid in full in cash and (y) all commitments under the DIP Loan Documents have been terminated. As used herein, a "*Lien*" means a mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, lien, security interest or other security arrangement.

(k) <u>Enforceable Obligations</u>. The DIP Loan Documents shall constitute and evidence valid and binding DIP Obligations of the Debtor, which DIP Obligations shall be enforceable against the Debtor, its estate and any successors thereto (including any trustee or other estate representative in any Successor Case), and its creditors, in accordance with their terms. No obligation, payment, transfer or grant of security under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(l) <u>Super-Priority Administrative Claim Status</u>. In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall constitute allowed super-priority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out, over all other administrative expense claims, adequate protection and other diminution claims, unsecured claims and all other claims against the Debtor, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503, 506, 507, 546, 726,

15

1113 and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment (the "**DIP Super-Priority Claims**").   The DIP Super-Priority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against the Debtor, and shall be payable from and have recourse to all pre-petition and post-petition property of the Debtor and all proceeds thereof, including Avoidance Actions.   Other than as provided in the Loan Documents and this Interim Order solely with respect to the Carve-Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, 331 and 503 of the Bankruptcy Code, or otherwise, that have been or may be incurred in this Case or in any Successor Case, and no administrative priority claims or other priority claims are, or will be, senior to, prior to or *pari passu* with, the DIP Liens or the DIP Super-Priority Claims, or with any other claims of the DIP Lender and its affiliates arising under the DIP Loan Documents.

3.      **Automatic Post-Petition Lien Perfection**.   The DIP Liens shall, immediately and without any further action, be valid, binding, fully perfected, continuing, enforceable and non-avoidable upon the entry of this Interim Order by the Court.   This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the DIP Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein.   Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file financing statements, mortgages, security agreements, notices of Liens

16

and other similar documents, and is hereby granted relief from the automatic stay of section 362

of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security

agreements, notices and other agreements or documents shall be deemed to have been filed or

recorded at the time and on the Commencement Date and shall constitute DIP Loan Documents.

The Debtor shall execute and deliver to the DIP Lender all such financing statements, mortgages,

notices and other documents as the DIP Lender may reasonably request to evidence and confirm

the contemplated priority of the DIP Liens granted pursuant hereto.    Without limiting the

foregoing, the DIP Lender, in its discretion, may file a photocopy of this Interim Order as a

financing statement with any recording officer designated to file financing statements or with

any registry of deeds or similar office in any jurisdiction in which the Debtor has real or personal

property, and in such event, the subject filing or recording officer shall be authorized to file or

record such copy of this Interim Order.    Subject to the entry of the Final Order, any provision of

any lease, loan document, easement, use agreement, proffer, covenant, license, contract,

organizational document, or other instrument or agreement that requires the payment of any fees

or obligations to any governmental entity or non-governmental entity in order for the Debtor to

pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the

proceeds thereof or other Collateral, is and shall be deemed to be inconsistent with the provisions

of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such

leasehold interests or other applicable Collateral or the proceeds of any assignment and/or sale

thereof by the Debtor, in favor of the DIP Lender in accordance with the terms of the DIP Loan

Documents.

CH\1692398.10

4.     **Carve-Out**.  Subject to the terms and conditions contained in this paragraph 4,

the DIP Liens and DIP Super-Priority Claims shall be subject and subordinate in all respects to

payment of the Carve-Out (as defined below):

(a)     For purposes of this Interim Order, "*Carve-Out*" means (i) all unpaid fees

required to be paid in this Case to the Clerk of the Court and to the office of the United States

Trustee under 28 U.S.C. § 1930 and 31 U.S.C. § 3717, whether arising prior to or after the

delivery of the Carve-Out Trigger Notice (as defined below); (ii) all reasonable and documented

unpaid fees, costs, disbursements and expenses (the "*Debtor Professional Fees*") of

professionals retained by the Debtor in this Case (collectively, the "*Debtor's Professionals*") that

(A) are incurred and earned prior to the first business day after the delivery by the DIP Lender of

a Carve-Out Trigger Notice, (B) are allowed by the Court under sections 105(a), 328, 330 or 331

of the Bankruptcy Code (whether allowed by the Court prior to or after delivery of a Carve-Out

Trigger Notice) and (C) remain unpaid after application of any retainers and any available funds

remaining in the Debtor's estate for such creditors; (iii) all reasonable and documented unpaid

fees and expenses (the "*Committee Professional Fees*," and together with the Debtor

Professional Fees, the "*Professional Fees*") of professionals retained by the Committee in this

Case (collectively, the "*Committee's Professionals*") and all reasonable out-of-pocket expenses

of any member of the Committee that (A) are incurred and earned prior to the first business day

after the delivery by the DIP Lender of a Carve-Out Trigger Notice, (B) are allowed by the Court

under sections 105(a), 330 or 331 of the Bankruptcy Code (whether allowed by the Court prior to

or after delivery of a Carve-Out Trigger Notice) and (C) remain unpaid after application of any

available funds remaining in the Debtor's estate for such creditors; (iv) all reasonable and

documented unpaid fees, costs, disbursements and expenses of the Debtor's Professionals and

18

Committee's Professionals that (A) are incurred and earned on or after the first business day after

the delivery by the DIP Lender of a Carve-Out Trigger Notice, (B) are allowed by the Court

under sections 105(a), 328, 330 or 331 of the Bankruptcy Code and (C) remain unpaid after

application of any retainers and any available funds remaining in the Debtor's estate for such

creditors, up to an aggregate amount for all such Professional Fees not to exceed $150,0000

(the "*Carve-Out Cap*"); provided, however, that notwithstanding anything to the contrary herein,

the aggregate amount of fees, disbursements, costs and expenses incurred (whether before or

after the delivery of any Carve Out Trigger Notice) by the Committee's Professionals that may

be included in the Carve-Out shall not exceed $50,000; and (v) in the event of a conversion of

the Case to a case under chapter 7 of the Bankruptcy Code, the payment of fees and expenses

incurred by a trustee and any professionals retained by such trustee in an aggregate amount not to

exceed $75,000 (clauses (i) through (v), collectively, the "*Carve-Out*").  Promptly following the

delivery of a Carve-Out Trigger Notice, the Debtor shall immediately fund into a segregated

account established by the Debtor (the "*Carve-Out Account*") an amount equal to the aggregate

unpaid amount accrued under the Carve-Out prior to the delivery of the Carve-Out Trigger

Notice, plus the amount of the Carve-Out Cap.  If there are insufficient funds on the date the

Carve-Out Trigger Notice is delivered to fund the Carve-Out Account, any additional cash

proceeds thereafter received by the Debtor, from whatever source, shall be transferred by the

Debtor into the Carve-Out Account prior to making any distributions to creditors until the Carve-

Out Account is fully funded in accordance with this paragraph 4.  All funds in the Carve-Out

Account shall be used first to pay the obligations set forth in clauses (i) through (iii) of the

definition of Carve-Out in subsection (a), above, and then, to pay the obligations set forth in

clause (iv) of the definition of Carve-Out set forth in subsection (a) above.   All amounts

19

deposited in the Carve-Out Account shall continue to be subject to the DIP Liens and DIP Super-Priority Claims such that, upon final payment of all allowed amounts due and owing under the Carve-Out, including the Carve-Out Cap, as determined by further order of the Court, any funds remaining in the Carve-Out Account shall be remitted to the Debtor and governed by the terms of this Interim Order. Notwithstanding anything to the contrary in this Interim Order, all Liens and claims granted pursuant to the Interim Order shall be subject to the Carve-Out. The term *"Carve-Out Trigger Notice"* shall mean a written notice delivered by the DIP Lender or its counsel to the Debtor's lead counsel, the U.S. Trustee and lead counsel to the Committee appointed in this Case, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default, expressly stating that the Carve-Out is invoked.

(b)      Any payments actually made pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 or otherwise to Debtor's Professionals or Committee's Professionals shall (i) not be paid from the proceeds of any Collateral (including Cash Collateral) until such time as all retainers, if any, held by the Debtor's Professionals or the Committee's Professionals, as applicable, have been reduced to zero and (ii) in the case of any payments made on account of any fees and expenses described in clause (iv) of the definition of Carve-Out, reduce the applicable Carve-Out Cap on a dollar-for-dollar basis. So long as no Carve-Out Trigger Notice has been delivered to the Debtor, the Debtor is authorized to use advances under the DIP Facility and Cash Collateral, in accordance with and limited to the amounts set forth on the Approved Budget, on a cumulative basis by Debtor Professional or Committee Professional, as applicable, to pay such compensation and expense reimbursements of the Debtor's Professionals and the Committee's Professionals as the same may be due and payable (but regardless of when such compensation and reimbursement of expenses are so allowed). Any compensation and expenses

20

previously paid, or accrued but unpaid, prior to the delivery of the Carve-Out Trigger Notice shall not reduce the Carve-Out Cap.

(c)      No portion of the Carve-Out, Collateral proceeds, or any proceeds of the DIP Facility may be used for the payment of the fees, costs and expenses of any person incurred challenging, or in relation to the challenge of, the DIP Liens, the DIP Super-Priority Claims, the other DIP Protections, or any other Liens or claims of the DIP Lender or its affiliates, or in the initiation or prosecution of any claim or cause of action against any or all of the DIP Lender or its affiliates, including any claim under Chapter 5 of the Bankruptcy Code.

(d)      Furthermore, none of the Carve-Out, Collateral proceeds, or any proceeds of the DIP Facility shall be used to prevent, hinder or delay the DIP Lender and/or its designee from enforcing or realizing upon the Collateral once a default or Event of Default has occurred and is continuing under the DIP Loan Documents in accordance with this Interim Order.

(e)      Nothing herein shall be construed as consent to the allowance of any Debtor Professional Fees, Committee Professional Fees or the professional fees or expenses of any unofficial committee or any other party in interest, or shall affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses.

(f)      The DIP Lender shall not be responsible for the direct payment or reimbursement of any Debtor Professional Fees or Committee Professional Fees incurred in this Case or any Successor Case. Nothing in this Interim Order or otherwise shall be construed (i) to obligate the DIP Lender in any way to pay compensation or to reimburse expenses of any of the Debtor's Professionals or the Committee's Professionals or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve-Out if the actual Debtor Professional Fees or Committee Professional Fees are higher than reflected in the

21

Approved Budget or there are otherwise permitted by this Interim Order; or (iii) as consent to the allowance of any Professional Fees. Any funding of the Carve-Out shall be added to and made a part of the DIP Obligations and secured by the Collateral and otherwise entitled to the protections granted under this Interim Order, the other DIP Loan Documents, the Bankruptcy Code and applicable law. Notwithstanding anything to the contrary herein, the DIP Lender shall have the right to establish a reserve against its commitments under the DIP Facility in an amount equal to the Carve-Out (including the Carve-Out Cap), as such amount may change from time to time.

5. **Credit Bid**. The DIP Lender shall have the unqualified right to credit bid all or any portion of the DIP Obligations under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code (including as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(i)-(iii) of the Bankruptcy Code), or (iii) a sale or other disposition by a chapter 7 trustee for the Debtor under section 725 of the Bankruptcy Code.

6. **Discharge Waiver**. The Debtor expressly stipulates, and the Court finds and adjudicates that, the DIP Obligations shall not be discharged or otherwise impaired by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of sections 524 and/or 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization and all commitments under the DIP Facility have been terminated.

7. **Protection of DIP Lender's Rights**.

(a) Unless the DIP Lender shall have provided its prior written consent or all DIP Obligations have been indefeasibly paid in full in cash and the DIP Facility has terminated,

22

there shall not be entered in this Case or in any Successor Case any order which authorizes (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Collateral or that is entitled to administrative priority status, in each case which is superior to or *pari passu* with the DIP Liens or DIP Super-Priority Claims granted pursuant to this Interim Order; or (ii) the use of Collateral or DIP Facility advances proceeds for any purpose other than in accordance with the Approved Budget and the DIP Loan Documents.

(b)    The Debtor and its employees (and/or its legal and financial advisors in the case of clauses (ii) through (iv) below) will (i) maintain books, records and accounts, in which full, true and correct entries in conformity with generally accepted accounting principles, consistently applied, shall be made of all financial transactions and matters involving the assets and business of the Debtor, (ii) cooperate, consult with, and provide to the DIP Lender and its affiliates and advisors all such information as required or allowed under the DIP Loan Documents (including this paragraph), including providing any pleadings proposed to be filed by the Debtor in this Case for the DIP Lender to review prior to filing, (iii) permit representatives of the DIP Lender and its affiliates (including the Proposed Purchaser) to (y) have full and complete access to, and to visit and inspect, any of the facilities or any assets owned or used in connection with the Debtor's business, any of the computer, accounting or operational systems owned or used in connection with the Debtor's business, and any of the books and records relating to the Debtor's business, and (z) discuss any matter relating to the Debtor's business affairs, operations and the sale process with the Debtor, its officers, directors, employees and advisors and other professionals, as often as may be reasonably requested. To the extent any affiliate of the Debtor has any facilities or assets or any computer, accounting or operational systems used in

23

connection with the Debtor's business or any books and records relating to the Debtor's business, the DIP Lender and Prospective Purchaser shall (i) have full and complete access to, and shall be entitled to visit and inspect, any such facilities or assets of such affiliate and any such computer, accounting or operational systems of such affiliate and any such books and records of such affiliate and (ii) shall be entitled to discuss any matter relating to the Debtor's business affairs, operations and the sale process with such affiliate, its officers, directors, employees and advisors and other professionals, as often as may be reasonably requested. In addition, each of the DIP Lender and the Prospective Purchaser and their respective financial advisors, consultants and other professionals and representatives shall be entitled to communicate directly with any and all vendors, customers, creditors or other parties in interest with respect to any matter involving the Debtor, including relating to the Debtor's business affairs, operations or the sale process.

8. **Proceeds of Subsequent Financing**. Without limiting the provisions and protections of paragraph 7 above, if at any time prior to the indefeasible payment in full in cash of all DIP Obligations and the termination of the DIP Facility, the Debtor's estate, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) or any other provision of the Bankruptcy Code or other applicable law in violation of the DIP Loan Documents (including this Interim Order), then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Lender until indefeasible payment in full in cash of the DIP Obligations.

9. **Disposition of Collateral; Additional Negative Covenants**. (a) The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral

24

without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or any order of this Court), except (i) as expressly permitted in the DIP Loan Documents, and (ii) as approved by the Court to the extent required under applicable bankruptcy law after notice and a hearing. Notwithstanding anything to the contrary in this Interim Order, any sale or other disposition of all or substantially all of the Debtor's assets or stock that does not provide for the indefeasible payment of the DIP Obligations in full in cash at closing shall be subject to the prior written consent of the DIP Lender, which consent may be withheld in the DIP Lender's sole discretion.

(b)     If the Debtor shall at any time (i) sell any Collateral outside of the ordinary course of business (and for avoidance of doubt, the disposition of vehicles pursuant to any fleet acquisition/maintenance plan approved by the DIP Lender in writing shall be deemed to be in the ordinary course), or (ii) suffer any loss, destruction or damage of property, including any actual, pending or threatened institution of any proceedings for the condemnation or seizure, or for the exercise of any right of eminent domain, of the Debtor's property (the events in clause (ii), collectively, an "*Event of Loss*"), then the Debtor shall promptly notify the DIP Lender of such proposed disposition or Event of Loss (including the amount of the estimated insurance or other proceeds to be received) and within one business day of receipt of such proceeds, the Debtor shall deliver, or cause to be delivered, 100% of the proceeds (net of reasonable transaction-related expenses determined acceptable by the DIP Lender) to the DIP Lender as a prepayment of the DIP Obligations; provided, however, that no mandatory prepayment shall be required in respect of any insurance payment received in respect of any loss of or damage to any vehicles in the course of its usage by any rental customer.

25

(c)      The Debtor shall not, without the prior written consent of the DIP Lender with respect to the applicable disbursement or agreement (regardless of whether such disbursement is reflected in the Approved Budget), make any disbursement or any series of related disbursements in excess of $10,000.  In addition, regardless of whether any of the following is included in the Approved Budget, the Debtor shall not, without the prior written consent of the DIP Lender, enter into or terminate (i) any Concession Agreements, (ii) except as permitted pursuant to any fleet acquisition/maintenance plan approved by the DIP Lender in writing, any leases or other arrangements with respect to any vehicles that will be part of the Debtor's fleet, (iii) any contracts or other agreements pursuant to which the Debtor has actual or potential monetary obligations that can be reasonably expected to exceed $5,000 in any four-week period or $25,000 on an annualized basis, or (iv) any contracts or other contracts outside the ordinary course of the Debtor's business other than any contracts involving the acquisition or leasing of vehicles that are permitted pursuant to any fleet acquisition/maintenance plan approved by the DIP Lender in writing.

10.      **Events of Default**. The following shall constitute an event of default under this Interim Order, unless waived in writing by the DIP Lender (the "*Events of Default*"):

(a)      The occurrence of an "Event of Default" under, and as defined in, the Governing DIP Agreement.

(b)      In the event the DIP Lender elects by written notice to the Debtor prior to the end of the Interim Period that it will require execution of the DIP Credit Agreement, the Debtor fails to enter into the DIP Credit Agreement within ten (10) business days of receiving a draft of the proposed DIP Credit Agreement from the DIP Lender.

CH\1692398.10

(c)     The Debtor proposes or supports, directly or indirectly, any plan of reorganization or sale of all or substantially all of the Debtor's assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash, upon the consummation of such plan of reorganization or such sale, of all DIP Obligations.

(d)     The failure of the Debtor to timely comply with any of the following sale process milestones or the failure of the Debtor to incorporate such milestones into a bid procedures motion in form and substance reasonably acceptable to the DIP Lender (the "***Bid Procedures Motion***"), and a bid procedures order consistent with the Non-Binding 363 Sale Term Sheet attached to the DIP Motion as **Exhibit C** (the "***Sale Term Sheet***") and otherwise in form and substance acceptable to the DIP Lender in its sole discretion, which shall contain the bid protections, including a break-up fee, as more fully set forth in the Bid Procedures Motion ("***Bid Procedures Order***"):

(i)     on or prior to the 4th day following the Commencement Date, the Debtor shall file the Bid Procedures Motion and proposed form of Bid Procedures Order;

(ii)    the preliminary hearing on the Bid Procedures Motion shall be completed on or prior to November 19, 2013;

(iii)   the final hearing on the Bid Procedures Motion shall be completed on or prior to November 22, 2013;

(iv)    the Bid Procedures Order shall have been entered by this Court on or prior to November 22, 2013;

(v)     on or prior to [December 4, 2013], all qualified bids (as described in the Sale Term Sheet) shall be due (which bid deadline shall not be extended without the consent of the DIP Lender);

(vi)    the auction shall, if necessary, be completed on or prior to December 9, 2013;

(vii)   the preliminary hearing to approve the sale to the winning bidder shall have concluded on or prior to December 10, 2013;

27

(viii)   the final hearing to approve the sale to the winning bidder shall have concluded on or prior to December 17, 2013;

(ix)    on or prior to [January 3, 2013] such sale shall have been consummated pursuant to definitive documentation acceptable in form and substance to the DIP Lender.

(e)    Any breach or other violation by the Debtor of any term condition set forth in the Sale Term Sheet.

(f)    Any other breach or violation by the Debtor of the terms and provisions of this Interim Order.

11.    **Rights and Remedies Upon Event of Default**.

(a)    Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Lender may, (i)(1) declare all or any portion of the DIP Obligations to be immediately due and payable, (2) declare the termination, reduction or restriction of any further commitment to extend credit to the Debtor, to the extent any such commitment remains, and (3) terminate the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Obligations, the DIP Liens, DIP Super-Priority Claims or the other DIP Protections; and (ii) declare a termination, reduction or restriction on the ability of the Debtor to use any Cash Collateral (any such declaration shall be made in writing to the Debtor, the Committee and the U.S. Trustee, and shall be referred to herein as a *"Termination Declaration"* and the date of such Termination Declaration being herein referred to as the *"Termination Declaration Date"*).

(b)    In addition to the remedies described above and other customary remedies, five (5) days following the Termination Declaration Date, the DIP Lender shall have relief from the automatic stay without further notice or order of this Court and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the DIP

28

Obligations, occupy the Debtor's premises to sell or otherwise dispose of the Collateral or

otherwise exercise remedies against the Collateral permitted by applicable non-bankruptcy law.

During such five (5) day period, the Debtor and the Committee shall be entitled to an emergency

hearing before the Court for the sole purpose of contesting whether an Event of Default has

occurred.  Unless the Court at such hearing determines that an Event of Default has not occurred

and is not continuing, the automatic stay, as to the DIP Lender (and, if applicable, its designee),

shall automatically terminate at the end of such five (5) day period, without further notice or

order.  Neither section 105 nor any other provision of the Bankruptcy Code shall be utilized to

preclude or restrict the DIP Lender (or its designee) from exercising its default-related rights and

remedies under the DIP Loan Documents and applicable law.  Notwithstanding the foregoing,

nothing herein shall preclude the DIP Lender from seeking an order from the Court authorizing

the DIP Lender to exercise any enforcement rights or remedies with respect to the Collateral on

less than five (5) days' notice.

      (c)     Without limiting the foregoing, upon the request of the DIP Lender

following the expiration of such five (5) day period, the Debtor shall use commercially

reasonable efforts to market and sell all or such portion of the Collateral as the DIP Lender shall

specify and on such terms and conditions and pursuant to such bidding procedures as is

acceptable to the DIP Lender, and remit the proceeds therefrom to the DIP Lender for application

to the DIP Obligations, and in connection with the foregoing, the Debtor shall file and use

commercially reasonable efforts to pursue one or more motions under section 363 of the

Bankruptcy Code, in form and substance satisfactory to the DIP Lender, for the entry of order(s)

of the Court (in form and substance satisfactory to the DIP Lender) approving bidding

CH\1692398.10

procedures (acceptable to the DIP Lender) governing each such sale of Collateral and approving each such sale of Collateral that has been approved by the DIP Lender.

(d)    All proceeds realized in connection with the exercise of the rights and remedies of the DIP Lender shall be for application to the DIP Obligations under, and in accordance with the provisions of, the DIP Loan Documents until indefeasible payment in full in cash of the DIP Obligations.

(e)    Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Lender contained in the DIP Loan Documents, or otherwise available at law or in equity, upon reasonable prior written notice to the Debtor and any landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default has occurred and is continuing, the DIP Lender (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Lender, enter upon any leased or licensed premises of the Debtor for the purpose of exercising any remedy with respect to Collateral located thereon and (ii) shall be entitled to all of the Debtor's rights and privileges as lessee or licensee under the applicable lease or license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtor, which are owned by or subject to a Lien of any third party and which are used by Debtor in its businesses, in all cases without interference from lienholders, leasors or licensors thereunder, provided, however, that the DIP Lender shall pay only rent and additional rent, fees, royalties or other obligations of the Debtor that first arise after delivery of the written notice referenced above from the DIP Lender and that are payable during the period of such occupancy or use by such DIP Lender calculated on a *per diem* basis. Nothing herein shall require the Debtor or the DIP Lender to assume any lease or license under section

30

365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Lender in this paragraph 11.

        (f)      The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Loan Documents as necessary to (i) permit the Debtor to grant the DIP Liens and to incur all liabilities and obligations to the DIP Lender under the DIP Loan Documents, (ii) authorize the DIP Lender to retain and apply payments hereunder, and (iii) as otherwise necessary to implement and effectuate the provisions of this Interim Order.

       12.    **Preservation of Rights Granted Under the Interim Order**.

        (a)      No Non-Consensual Modification or Extension of Interim Order.  Unless all DIP Obligations shall have been indefeasibly paid in full in cash and the DIP Facility shall have been terminated, the Debtor shall not seek, and it shall constitute an Event of Default, if there is entered (i) an order amending, supplementing, extending or otherwise modifying this Interim Order or (ii) an order converting or dismissing the Case, in each case, without the prior written consent of the DIP Lender, which consent shall not be implied by any other action, inaction or acquiescence.

        (b)      Dismissal.  If any order dismissing the Case under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) to the fullest extent permitted by law that (i) the DIP Protections shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations have been indefeasibly paid in full in cash and the DIP Facility is terminated (and that all DIP Protections shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction,

notwithstanding such dismissal, for the purposes of enforcing such DIP Protections and DIP Obligations.

(c)    Modification of Interim Order. Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed by a subsequent order of this Court or any other court, the DIP Lender shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such reversal, modification, vacatur or stay shall affect (i) the validity, priority or enforceability of any DIP Protections granted or incurred prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, modification, vacatur or stay or (ii) the validity or enforceability of any Lien, claim, or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations. Notwithstanding any such reversal, modification, vacatur or stay, any DIP Obligations incurred by the Debtor prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all of the DIP Protections, and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the other DIP Loan Documents with respect to all DIP Obligations.

(d)    Survival of Interim Order. The provisions of this Interim Order, the other DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections, and all other rights, remedies, Liens, priorities, privileges, protections and benefits

32

granted to any or all of the DIP Lender and its affiliates shall survive, and shall not be modified, impaired or discharged by, the entry of any order confirming any plan of reorganization in the Case, converting the Case to a case under chapter 7, dismissing the Case, withdrawal of the reference as to the Case or any Successor Case or providing for abstention from handling or retaining of jurisdiction of the Case in this Court, or terminating the joint administration of this Case or by any other act or omission. The terms and provisions of this Interim Order, including all of the DIP Protections and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted to the DIP Lender, shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Protections shall continue in these proceedings and in any Successor Case, and shall maintain their respective priorities as provided by this Interim Order.

13.    **Waiver of Section 506(c) Claims**.  As a further inducement, and condition of, to the DIP Lender providing the DIP Facility and consenting to the Carve-Out to the extent provided herein, the Debtor and any successors thereto or any representatives thereof, including any trustees appointed in the Case or any Successor Case, shall be deemed to have waived any rights, benefits, or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Lender and/or any Collateral.  Nothing contained in this Interim Order or in any Final Order shall be deemed a consent by the DIP Lender to any charge, Lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

14.    **Other Rights and Obligations**.

(a)    Expenses.  All pre-petition and post-petition fees, costs and expenses of the DIP Lender and Proposed Purchaser (including, without limitation, the fees, costs and expenses of any legal counsel, consultants, accounting firms, auditors, financial advisors or other

CH\1692398.10

advisors and professionals retained by the DIP Lender and Proposed Purchaser from time to time) incurred in connection with this Case, the diligencing, negotiation, documentation, consummation, administration or any other aspect of the DIP Facility and the DIP Loan Documents, the diligencing, negotiation, documentation, consummation or any other aspect of any credit bid or other bid by the DIP Lender or Proposed Purchaser or the sale process in this Case, or incurred in connection with the enforcement of rights and remedies under the DIP Loan Documents or applicable law are to be reimbursed on a current basis by the Debtor and shall in any event constitute part of the DIP Obligations. For avoidance of doubt, all such fees and expenses described in the immediately preceding sentence shall be reimbursed without regard to the amounts set forth in the Approved Budget with respect thereto and without regard to whether such amounts were incurred prior to or after the Commencement Date. All such obligations shall constitute DIP Obligations. Professionals for the DIP Lender and its affiliates (collectively, the "**DIP Lender Professionals**") shall not be required to comply with the U.S. Trustee fee rules and guidelines. If the Debtor objects to the reasonableness of the fees and expenses of any DIP Lender Professional and cannot resolve such objection within ten (10) days of receipt of summary invoices, the Debtor shall file with the Court and serve on such DIP Lender Professional an objection (the "**Fee Objection**") limited to the issue of reasonableness of such disputed fees and expenses. The Debtor shall timely pay in accordance with the terms and conditions of this Interim Order the undisputed fees, costs and expenses reflected on any invoice to which a Fee Objection has been timely filed.

(b)    <u>Binding Effect</u>. The provisions of this Interim Order, including all findings herein, and the other DIP Loan Documents shall be binding upon all parties in interest in this Case, including the DIP Lender, all pre-petition creditors, whether or not secured, the

34

Committee and the Debtor and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor, any examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary or responsible person appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor), whether in the Case, in any Successor Case, or upon dismissal of any such Case or Successor Case; provided, however, except as expressly provided herein, that the DIP Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estate of the Debtor in the Case or Successor Case.

(c)    No Waiver.  The failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies under the DIP Loan Documents or otherwise (or any delay in seeking or exercising same), shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Except as expressly provided herein, nothing contained in this Interim Order shall impair or modify any rights, claims or defenses available in law or equity to the DIP Lender, including rights of setoff (or the right of a Debtor to contest such assertion).  The entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, the ability of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of the Case to a case under Chapter 7, dismissal of the Case, or the appointment of a trustee in the Case, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to the Debtor, or (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender.

35

(d)    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.  In determining to make any loan (whether under the Governing DIP Agreement or otherwise) or in exercising any rights or remedies as and when permitted pursuant to the DIP Loan Documents, the DIP Lender shall not (i) be deemed to be in control of the operations of the Debtor, or (ii) owe any fiduciary duty to the Debtor, its creditors, shareholders or estate.

(e)    <u>No Marshaling</u>.  The DIP Lender shall not be subjected to, and the Debtor shall not attempt to subject the DIP Lender to, the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral, as applicable.

(f)    <u>Amendments</u>.  The Debtor is authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, unless such amendment, modification, supplement or waiver (i) increases the interest rate (other than as a result of the imposition of the default rate), (ii) increases the aggregate lending commitments of the DIP Lender in respect of the DIP Facility (except for such increase expressly permitted under the DIP Loan Documents), (iii) changes the maturity date, or (iv) adds or amends (in any respect unfavorable to the Debtor) any Event of Default.  No waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by on behalf of all the Debtor and the DIP Lender and, except as permitted herein without further order, approved by this Court.

36

(g)    Inconsistency.  In the event of any inconsistency between the terms and conditions of the other DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(h)    Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Commencement Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule or Local Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(i)    Headings.  Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

15.    **Final Hearing**.

(a)    The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2013, at [   ] p.m (prevailing Central time) at the United States Bankruptcy Court for the Southern District of Mississippi.  The proposed Final Order shall be substantially the same as the Interim Order except that (i) those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification, and (ii) modifications to settle objections duly raised prior to the Final Hearing.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtor and entered by this Court.

37

(b)    <u>Final Hearing Notice</u>.  On or before [   ], 2013 the Debtor shall serve, by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing), (i) notice of the entry of this Interim Order and of the Final Hearing (the "***Final Hearing Notice***") and (ii) a copy of this Interim Order, on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to the Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than [   ], 2013, which objections shall be served so that the same are received on or before such date by:  (a) the Debtor, [          ], Attn.: [      ]; (b) proposed counsel for the Debtor, [    ], Attn.: [      ]; (c) counsel to any statutory committee appointed in this Case; (d) counsel to the DIP Lender, (i) Latham & Watkins LLP, 233 South Wacker Drive, Suite 5800, Chicago, IL 60606, Attn: Richard Levy, and (ii) Watkins and Eager, PLLC, P.O. Box 650, Jackson, MS 39205; and [(g) the United States Trustee [            ].

16.    **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: November __, 2013

CH\1692398.10

**<u>EXHIBIT A</u>**

**DIP Term Sheet**

CH\1692398.10

## **EXHIBIT B**

## **Initial Approved Budget**

ButlerSnow 18291055v1

CH\1692398.10

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

In re:                                                 )
                                                       )
**SIMPLY WHEELZ LLC D/B/A ADVANTAGE** )
**RENT-A-CAR**                                         )          **CASE NO. 13-03332-ee**
                                                       )          **Chapter 11**
                                                       )
        **Debtor**                                     )
                                                       )
_____ )

## SECTION 363 SALE DIP LOAN TERM SHEET

### Summary of Key Terms and Conditions for
### First Priority Senior Secured $36 Million DIP Multi-Draw Term Loan Facility

This term sheet (this "Term Sheet") shall not become binding unless and until (1) the Term Sheet is signed by the DIP Lender and the Debtor, and (2) the Interim Order approving the DIP Facility contemplated by this Term Sheet has been approved. Prior to satisfaction of the two conditions set forth in the immediately preceding sentence, this Term Sheet shall be non-binding, for discussion purposes only and shall not be construed as a commitment of any kind to provide the DIP Facility.

This Term Sheet sets forth certain of the key terms and conditions by which The Catalyst Capital Group Inc., on behalf of one or more funds managed by it and/or through certain affiliates (the "DIP Lender"), is willing to provide Simply Wheelz LLC d/b/a Advantage Rent A Car (the "Company" or the "Debtor")[1] with a first priority senior secured (the "Commitment") DIP multi-draw term loan facility (the "DIP Facility") in an amount of $36 million (which may be increased up to an incremental $10 million to a total of up to $46 million in the sole discretion of the DIP Lender) in the event the Company commences a voluntary chapter 11 case (the date of commencement, the "Petition Date") to facilitate a sale of the Debtor's assets pursuant to section 363 of the Bankruptcy Code.

Unless otherwise stated herein, each material term set forth herein shall be included in an interim order in form and substance satisfactory to the DIP Lender in its sole discretion (the "Interim Order") and final order in form and substance satisfactory to the DIP Lender in its sole discretion (the "Final Order;" together with the Interim Order, the "DIP Order"), each authorizing the extension of the DIP Facility contemplated hereby.

| **Stalking Horse Bid** | This financing proposal is contingent upon the agreement of the parties regarding a stalking horse bid by the DIP Lender and/or one or more of its affiliates or designees (the "Proposed Purchaser") to acquire substantially all of the Debtor's assets (any such bid by the DIP Lender and/or one or more of its affiliates or designees, a "DIP Lender 363 Bid") and a mutually satisfactory arrangement with the Federal Trade |
|---|---|

---

[1] To the extent any non-debtor affiliate of the Company (including, without limitation, FSNA) owns or shares any property (including, without limitation, any computer, accounting or other operating system or data base) that is used in connection with the Company's business, then such affiliate shall guarantee and be jointly and severally liable in respect of, the DIP Facility and shall grant first priority liens on all of its assets, and all references to the "Company" or "Debtor" herein shall include each such non-debtor affiliate.

**EXHIBIT**

" B "

| | |
|---|---|
| | Commission regarding Proposed Purchaser's stalking horse bid and bidding procedures. The Debtor also agrees to maintain the fleet of vehicles in the ordinary course of business or as otherwise agreed to by the Proposed Purchaser. Certain terms of the DIP Lender 363 Bid are described in the "Non-Binding 363 Sale Term Sheet" to which this Term Sheet is attached as an exhibit (the "363 Sale Term Sheet"). |
| **DIP Loans** | Subject to closing conditions and reasonable documentation to be agreed, including, without limitation, the Interim Order and the Final Order (the "DIP Documentation"), the DIP Lender shall be the sole lender in connection with the DIP Facility. The proceeds of the loans made under the DIP Facility (the "DIP Loans") shall be used by the Company for certain limited purposes in connection with the sale of the Debtor' assets pursuant to the Budget.<br><br>The DIP Loans will be made in multiple draws, with the first draw in the amount of $[____] and occurring on the day the Interim Order is entered (or on such later date as mutually agreed among the Debtor and the DIP Lender) and the Debtor may make subsequent draws from time to time in amounts of at least $1 million (or if higher, in increments of $100,000), subject to (x) receipt of three business day's prior written notice of a borrowing request, (y) compliance with the Budget as described below and (z) the absence of any Event of Default or any event, circumstance or condition that, with the passage of time, would become an Event of Default; provided, however, prior to the entry of a Final Order, the Debtor shall not be permitted to borrow more than [$_____]² under the DIP Facility. No individual draw can exceed the 7-day disbursement amounts required under the Budget for the specific period (other than disbursements to fund deposits pursuant to the Budget), including permitted variance set forth below.<br><br>Upon being drawn down, proceeds of the DIP Loans, which shall constitute the DIP Lender's cash collateral, will be deposited into a segregated bank account of the Debtor acceptable to the DIP Lender (each, a "DIP Account"); provided that the DIP Lender shall at all times have a perfected first priority lien thereon as well as sole dominion and control, in either case, pursuant to the DIP Order and, if so requested by the DIP Lender on not less than three (3) business days' prior notice, a deposit account control agreement reasonably acceptable to the DIP Lender. So long as no Default or Event of Default (each as defined below) shall have occurred and be continuing, amounts in the DIP Accounts may be used by the Debtor for certain limited purposes in connection with the sale of the Debtor's assets pursuant to the Budget.<br><br>Any amounts remaining in the DIP Account at the maturity of the DIP Facility (whether by acceleration or otherwise) shall be applied to reduce the DIP Obligations (as defined below) then outstanding.<br><br>As used herein, the term "DIP Obligations" shall mean all principal, interest, fees, costs, expenses, charges and other amounts owing to the DIP Lender in respect of the DIP Facility. |

---

² This amount should reflect the borrowing needs of the Debtor for the first 30 days of the Chapter 11 Case as set forth in the Budget.

| Interest Rate | Interest on the DIP Obligations shall be payable monthly in arrears in cash. The outstanding principal amount of all DIP Obligations shall bear interest at the LIBOR Rate (to be defined as the higher of (x) the rate per annum (adjusted for statutory reserve requirements for Eurocurrency liabilities) at which Eurodollar deposits are offered in the interbank Eurodollar market "British Bankers' Association Interest Settlement Rate" for US dollars for the applicable interest period, as quoted on the appropriate page of the Reuters Screen LIBOR01 Page (or any successor page or service) and (y) 2.0% per annum) plus 8.0 % per annum.<br><br>After the occurrence and during the continuance of an Event of Default (as defined below), all outstanding DIP Obligations shall bear an additional 2.00% per annum of interest, which additional interest will be payable on demand.<br>Interest on the DIP Facility shall be paid in cash, monthly in arrears.<br><br>Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days. |
|---|---|
| Fees | A Closing Fee equal to 2.0% of the total commitments under DIP Facility (including, without limitation, commitments subject to entry of a Final Order) and payable in cash on the closing date from the proceeds of the DIP Facility.<br><br>An Undrawn Commitment Fee equal to 2.0% per annum times the daily average undrawn portion of the DIP Facility and payable in arrears in cash on the first business day of each calendar month.<br><br>A Funding Fee equal to 2.0% of the principal amount of each borrowing under the DIP Facility and payable in cash on the date on which such borrowing is made.<br><br>All fees will be non-refundable and calculated using a 360-day year and actual days elapsed. |
| Mandatory Prepayments | The following mandatory prepayments of the DIP Facility are required:<br><br>1. Asset Sales:    Immediately following the Debtor's receipt by the Debtor, prepayments in an amount equal to 100% of the proceeds (net of reasonable transaction-related expenses determined acceptable by the DIP Lender) of the sale or other disposition of any property or assets of the Debtor outside the ordinary course of business (and for avoidance of doubt, the disposition of vehicles pursuant to any fleet acquisition/maintenance plan approved by the DIP Lender in writing shall be deemed to be in the ordinary course).<br><br>2. Insurance Proceeds:    Immediately following the Debtor's receipt by the Debtor prepayments in |

|  | an amount equal to 100% of the insurance and condemnation proceeds (net of reasonable transaction-related expenses determined acceptable by DIP Lender) received on account of any loss of or damage to any property or assets of the Debtor; provided, however, that no mandatory prepayment shall be required in respect of any insurance payment received in respect of any loss of or damage to any vehicles in the course of its usage by any rental customer. |
| --- | --- |
| **Expense Reimbursement** | All pre-petition and post-petition fees and expenses of the DIP Lender and Proposed Purchaser (including, without limitation, the fees and expenses of any legal counsel, consultants, accounting firms, auditors, financial advisors or other advisors and professionals retained by the DIP Lender and Proposed Purchaser from time to time) incurred in connection with the Debtor's Chapter 11 Case, the diligencing, negotiation, documentation, consummation, administration or any other aspect of the DIP Facility and the DIP Documentation, the diligencing, negotiation, documentation, consummation or any other aspect of the DIP Lender 363 Bid or the sale process in this Chapter 11 Case or incurred in connection with the enforcement of rights and remedies under the DIP Facility are to be reimbursed on a current basis by the Debtor from the proceeds of DIP Loans and shall in any event constitute part of the DIP Obligations. For avoidance of doubt, all such fees and expenses described in the immediately preceding sentence shall be reimbursed without regard to the amounts set forth in the Budget with respect thereto and shall constitute DIP Obligations. |
| **Credit Bid** | The DIP Lender may, at its discretion, credit bid all or any portion of the DIP Obligations, in addition to any other amounts owing to the DIP Lenders, as part of any bid submitted in a sale of the Debtor's assets pursuant to §363(k) of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.. |
| **Maturity Date** | January 3, 2014, or such later date to which DIP Lender consents in writing in its sole discretion; provided that immediately upon written notice by the DIP Lender to counsel for the Debtor, counsel to any Official Committee of Unsecured Creditors and the Office of the United States Trustee following the occurrence and during the continuance of any Event of Default, the DIP Facility shall terminate without further notice, motion, hearing or action of any kind. |
| **Collateral** | All Loans and all other DIP Obligations owing by the Borrower to the DIP Lender, shall, at all times:<br><br>Super-priority: pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed super-priority administrative expense claims in each |

of the Bankruptcy Cases, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Borrower, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 and any other provision of the Bankruptcy Code or otherwise, subject only to the Carve-Out;

Unencumbered property:   pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by valid, perfected, first-priority security interests in and liens on all property and assets of the Borrower, and its estate, of every kind or type whatsoever, tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, wherever located; all property of the estate of the Borrower within the meaning of section 541 of the Bankruptcy Code; and all proceeds, rents and products of the foregoing (collectively, the "Property") that is not subject to non-avoidable, valid and perfected liens in existence as of the Petition Date (or to non-avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code), subject only to the Carve-Out. For avoidance of doubt, the DIP Lender shall have a first priority, automatically perfected, security interest and lien upon the Debtor's rights in any airport concession agreement and other related agreements and the right to the proceeds from the sale of any airport concession agreement or any related agreement pursuant to sections 363 and 365 of the Bankruptcy Code; and

Junior liens:   pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by valid junior perfected security interests in and liens on all Property that is subject to non-avoidable, valid and perfected liens in existence as of the Petition Date, or to non-avoidable valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code, subject only to the Carve-Out; and

Priming liens:   pursuant to section 364(d)(1) of the Bankruptcy Code, be senior to (i) the indebtedness of the Debtor to Bank of America or any affiliate thereof (collectively, the "BofA Indebtedness") and (ii) and be secured by valid senior perfected security interests in and liens on all Property that is subject to any non-avoidable, valid and perfected liens that secures any BofA Indebtedness.

| | |
|---|---|
| **Conditions Precedent** | Customary conditions precedent for debtor-in-possession financings of this type, including without limitation, the entry of the Interim Order and the absence of any Event of Default or any event, circumstance or condition, that with the passage of time, would become an Event of Default. |
| **Representations and Warranties** | The Debtor shall be deemed to have made usual and customary representations and warranties for debtor-in-possession financings of this type relating to the Debtor, its business and its assets acceptable to the DIP Lender, including, without limitation, the representations and warranties concerning incorporation and good standing, authorization, compliance with laws, tax status and environmental compliance. |

| | |
|---|---|
| **Affirmative Covenants** | The Debtor shall comply with usual and customary affirmative covenants for debtor-in-possession financings of this type acceptable to the DIP Lender, including, without limitation: (i) delivery of financial reporting; (ii) provision of notices of litigation, defaults and unmatured defaults and other information (including pleadings, motions, applications and other documents filed with the Bankruptcy Court or distributed to any official committee appointed in the chapter 11 cases); (iii) maintenance of existence; (iv) payment of post-petition taxes and claims; (v) maintenance of properties; (vi) maintenance of insurance; (vii) compliance with laws; (viii) environmental matters; (ix) additional collateral and guarantors; and (x) maintenance of books and records; (xi) conduct of business; and (xii) further assurances. |
| **Negative Covenants** | The Debtor shall comply with usual and customary negative covenants for debtor-in-possession financings of this type acceptable to the DIP Lender, including, without limitation, the following (in each case without the prior written consent of the DIP Lender): |
| | (i) incurrence and repayment of indebtedness (including, without limitation, intercompany indebtedness); (ii) incurrence of liens; (iii) incurrence of negative pledges; (iv) making or agreeing to make restricted payments or restricted investments (including, without limitation, intercompany payments and investments); (v) equity issuances; (vi) agreeing to, or effectuating, any disposition of any Property (except as permitted pursuant to any fleet acquisition/maintenance plan approved by the DIP Lender in writing); (vii) agreeing to, or effectuating any acquisition, merger, consolidation or other change of control transaction; (viii) agreeing to, or effectuating, any fundamental changes; (ix) agreeing to, or effectuating, any transactions with affiliates; (x) engaging in any new business; and (xi) agreeing to, or effectuating any sale-leasebacks. |
| **Funding Protections** | Customary for debtor-in-possession financings, including, without limitation, breakage costs, gross-up for withholding, compensation for increased costs and compliance with capital adequacy and other regulatory restrictions. |
| **Budget Covenant** | Prior to the Petition Date, the Debtor shall deliver to the DIP Lender a budget commencing with the week during which the Petition Date occurs and ending on January 3, 2014, containing line items of sufficient detail to reflect the Debtor's projected receipts and disbursements on a weekly basis for such period as required to sell the Debtor's assets, and such budget shall be in form and substance satisfactory to the DIP Lender in its sole discretion (as amended, amended and restated, supplemented or otherwise modified from time to time with the prior written consent of the DIP Lender in its sole discretion, the "Budget"). |
| | The Debtor shall not permit the aggregate disbursements for any four week period in the Budget, and the cumulative disbursements for each period from November 1, 2013 through the last day of any month, to |

exceed the respective amounts set forth in the Budget for such four week period or such cumulative period by more than 10%. In addition, the Debtor shall not permit gross receipts for any four week period in the Budget, and for the cumulative period from November 1, 2013 through the last day of any month to be less than the respective amounts set forth in the Budget for such four week period or such cumulative period by more than 10%. Further, the Budget may be amended, amended and restated, supplemented or otherwise modified from time to time with the prior written approval of the DIP Lender in its sole discretion.

For avoidance of doubt, the Budget shall include a line item providing for payment of unpaid pre-petition wages, benefits and other employee obligations incurred in the ordinary course of the Seller's business, including amounts unpaid and pending as of the Petition Date, provided that the payment to any such person does not exceed the amount of the priority claim of §507(a)(4).

The Debtor shall not, without the prior written consent of the DIP Lender with respect to the applicable disbursement or agreement (regardless of whether such disbursement is reflected in the Budget), make any disbursement or any series of related disbursements in excess of $10,000. In addition, regardless of whether any of the following is reflected in the Budget, the Debtor shall not, without the prior written consent of the DIP Lender, enter into (i) any airport concession agreements, leases and similar contracts relating to facilities for any rental car locations, (ii) except as permitted pursuant to any fleet acquisition/maintenance plan approved by the DIP Lender in writing, any leases or other arrangements with respect to any vehicles that will be part of the Debtor's fleet, (iii) any contracts or other agreements pursuant to which the Debtor has actual or potential monetary obligations that can be reasonably expected to exceed $5,000 in any four week period or $25,000 on an annualized basis, or (iv) any contracts or other contracts outside the ordinary course of the Debtor's business other than any contracts involving the acquisition or leasing of vehicles that are permitted pursuant to any fleet acquisition/maintenance plan approved by the DIP Lender in writing.

| | |
|---|---|
| **Budget and Variance Reports and other Financial Reporting:** | The Debtor shall provide to the DIP Lender on a weekly basis, a variance report, certified by the chief financial officer of the Debtor, and in a form satisfactory to the DIP Lender, comparing actual cash disbursements and cash receipts on a line item basis for the immediately preceding week and for the cumulative period from the Petition Date to the amounts for the same weekly and cumulative periods set forth in the Budget, with a reasonably detailed explanation of the significant variances. |
| | The Debtor shall provide to the DIP Lender on a weekly basis a rolling 13 week cash flow forecast in form and substance satisfactory to the DIP Lender and shall provide such other financial and operating reports and such other information relating to the business as the DIP Lender may request from time to time. |
| | The DIP Lender and the Prospective Purchaser, and their respective financial advisors, consultants and other professionals and representatives shall (i) have full and complete access to and shall be entitled to visit and inspect, any of the facilities or any assets owned or |

|  | used in connection with the Debtor's business, any of the computer, accounting or operational systems owned or used in connection with the Debtor's business, and any of the books and records relating to the Debtor's business and (ii) shall be entitled to discuss any matter relating to the Debtor's business affairs, operations or the sale process with the Debtor, its officers, directors, employees and advisors and other professionals, as often as may be reasonably requested.  To the extent any affiliate of the Debtor has any facilities or assets or any computer, accounting or operational systems used in connection with the Debtor's business or any books and records relating to the Debtor's business, the DIP Lender and Prospective Purchaser shall (i) have full and complete access to and shall be entitled to visit and inspect, any such facilities or assets of such affiliate or any such computer, accounting or operational systems of such affiliate or any such books and records of such affiliate and (ii) shall be entitled to discuss any matter relating to the Debtor's business affairs, operations or the sale process with such affiliate, its officers, directors, employees and advisors and other professionals, as often as may be reasonably requested.  In addition, each of the DIP Lender and the Prospective Purchaser and their respective financial advisors, consultants and other professionals and representatives shall be entitled to communicate directly with any and all vendors, customers, creditors or other parties in interest with respect to any matter involving the Debtor, relating to the Debtor's business affairs, operations or the sale process. |
| :--- | :--- |
|  | The Debtor and its Board of Directors shall cooperate, and shall cause the Debtor's officers, employees, advisors and other professionals to cooperate, with the DIP Lender and the Prospective Purchaser in connection with the exercise of their access and informational rights as set forth in the immediately preceding paragraph. |
| **In the Event Proposed Purchaser is Not the Winning Bidder** | If (i) an entity other than Proposed Purchaser is the winning qualified bidder at the Auction, or (ii) the Debtor withdraws its support for the DIP Lender 363 Bid, or (iii) or the Debtor enters into agreements evidencing, or otherwise supports, a bid from a bidder other than the Proposed Purchaser, then at such time the DIP Obligations shall immediately become due and payable, and the Debtor shall, or shall cause such other bidder to, immediately pay off the DIP Obligations in full in cash at closing. |

| Limitations on Use of DIP Loans and Cash Collateral | Without the DIP Lender's prior written consent, none of the DIP Loans, Cash Collateral, Collateral (as defined below) or Carve-Out (as defined below) may be used for any of the following purposes: |
|---|---|
| | • object to or contest the validity or enforceability of the Interim Order or Final Order or any obligations outstanding under the DIP Documentation; |
| | • seek to modify any of the rights granted under the Interim Order, Final Order or any other DIP Documentation to the DIP Lender; |
| | • make any payment in settlement or satisfaction of any prepetition or administrative claim, unless in compliance with the Budget; or |
| | • object to, contest, delay, prevent or interfere with in any way the exercise of rights and remedies by the DIP Lender with respect to the Collateral once an Event of Default has occurred (except that Debtor may contest or dispute whether an Event of Default has occurred and the Debtor shall be entitled to any notice provisions provided in any Interim Order or Final Order). |
| Events of Default | In addition to customary events of default for post-petition loans, the occurrence of any of the following events, unless waived in writing by the DIP Lender shall constitute an event of default (each an "Event of Default") under the DIP Documentation and with respect to use of Cash Collateral: |
| | • failure to obtain the Final Order in form and substance satisfactory to the DIP Lender by the 30th day following the Petition Date; |
| | • filing of any motion by the Debtor seeking to obtain credit or incur indebtedness, or the obtaining of credit and incurrence of indebtedness, by the Debtor that is: (i) secured by a security interest, mortgage or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage, or other lien in favor of the DIP Lender described in this Term Sheet, or (ii) entitled to administrative priority status which is equal or senior to the DIP Claims (other than the Carve-Out) described in this Term Sheet; |
| | • institution of any judicial proceeding by the Debtor seeking to challenge the validity of any portion of the DIP Documentation, the DIP Obligations, or the applicability or enforceability of same or which seeks to void, avoid, limit, subordinate or otherwise adversely affect any security interest created by or in relation to the DIP Documentation; |
| | • reversal, vacatur or modification (without the consent of the DIP Lender) of the Interim Order or Final Order; |
| | • dismissal of the Debtor's Chapter 11 Case or conversion of any such case to a chapter 7 case; |
| | • failure of the Debtor to comply with the Budget herein, subject to the permitted variances; |

- failure of the Debtor to comply with, or achieve, any of the sale process milestones set forth in the 363 Sale Term Sheet;

- any breach by the Debtor of any provision of the Interim Order or the Final Order;

- any disruption of the business operations of any Debtor that has a material adverse effect;

- the appointment of an interim or permanent trustee in the Debtor's Chapter 11 Bankruptcy Case or the appointment of a receiver or an examiner in such Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtor;

- the payment of, or application for authority to pay, any pre-petition claim without the DIP Lender's prior written consent or unless otherwise permitted under the first day orders acceptable to the DIP Lender;

- the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the DIP Lender, its claims or its Collateral;

- the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a lien or other interest in any Collateral;

- any repossession by The Hertz Corporation or any affiliate thereof (collectively, "Hertz") of any vehicles in the Debtor's rental fleet, or the entry of an order by the Bankruptcy Court (x) permitting Hertz to repossess any vehicles in the Debtor's rental fleet, or (y) determining that the Debtor is no longer entitled to use or possess any portion of its Hertz-lease fleet; or

- (i) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Sale Procedures Order (as defined in the 363 Sale Term Sheet) or the Sale Approval Order (as defined in the 363 Sale Term Sheet) in any material respect, or any violation of any term or condition set forth in the Sale Procedures Order or the Sale Approval Order, in each case without the prior written consent of the DIP Lender or the filing by the Debtor of any motion or application seeking the entry of any such order without the prior written consent of the DIP Lender, or (B) the failure of the Definitive Agreements (as defined in the 363 Sale Term Sheet), or if approved by the Bankruptcy Court, any definitive asset purchase agreement constituting a higher and better bid, to remain in full force and effect at all times in all respects until the closing thereof (without any amendments or other modifications thereto as to which the DIP Lender has not given its prior written consent);

- the Federal Trade Commission shall have failed to approve either the Prospective Purchaser as the purchaser of the Purchased Assets (as defined in the 363 Sale Term Sheet) or the Transaction (as defined in the 363 Sale Term Sheet), in each case, on or before the earlier of November 15, 2013, and the time of entry of the Sale Procedures Order;

- any credit card issuer or processing company used by the Debtor

| | |
|---|---|
| | immediately prior to the Petition Date terminates or discontinues providing, or materially restricts, the financial accommodations or other services under its prepetition arrangement with the Debtor; or<br><br>• any online travel agency or other entity which immediately prior to the Petition Date provided online reservation services to the Debtor terminates or discontinues providing, or materially restricts, the reservation or other services under its pre-petition arrangement with the Debtor. |
| **Remedies Upon Occurrence of an Event of Default** | Upon prior written notice by the DIP Lender to counsel for the Debtor, the Office of the United States Trustee (and counsel to any appointed Official Committee of Unsecured Creditors) of the occurrence and continuance of an Event of Default (following the expiration of any applicable grace period), but subject to the provisions of the immediately following paragraph with respect to any enforcement action by the DIP Lender against any Collateral, the DIP Lender may (i) declare the DIP Obligations to be immediately due and payable; (ii) terminate the Debtor's ability to access the DIP Loans and to use Cash Collateral; and/or (iii) exercise all default-related rights and remedies, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code or otherwise.<br><br>In addition, upon the occurrence of any Event of Default (following the expiration of any applicable grace period), and following the giving of five business days' prior written notice to counsel for the Debtor, the Office of the United States Trustee (and counsel to any appointed Official Committee of Unsecured Creditors), the DIP Lender shall have relief from the automatic stay to foreclose on any or all of the Collateral and otherwise enforce its liens thereon. During such five business day notice period, the Debtor and the Official Committee of Unsecured Creditors shall be entitled to any emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred and is continuing. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred or is not continuing, then (i) the automatic stay, as to the DIP Lender, shall be automatically terminated at the end of such notice period, without further notice, hearing or order, (ii) neither Section 105 nor any other provision of the Bankruptcy Code shall be utilized to preclude or restrict the DIP Lender from exercising its default-related rights and remedies, and (iii) the Debtor shall cooperate with the DIP Lender to effect an orderly liquidation of its Collateral on terms and conditions acceptable to the DIP Lender.<br><br>Without limiting the foregoing, upon the request of the DIP Lender following the occurrence and during the continuance of any Events of Default, the Debtor shall use commercially reasonable efforts to sell all or such portion of the Collateral as the DIP Lender shall specify and on such terms and conditions and pursuant to such bidding procedures as is acceptable to the DIP Lender, and remit the proceeds therefrom to the DIP Lender for application to the DIP Obligations, and in connection with the foregoing, the Debtor shall file and use commercially reasonable efforts to pursue one or more motions under Section 363 of the Bankruptcy Code, in form and substance satisfactory to the DIP Lender, for the entry of order(s) of the Bankruptcy Court (in form and |

| | |
|---|---|
| | substance satisfactory to the DIP Lender) approving bidding procedures (acceptable to the DIP Lender) governing each such sale of Collateral and approving each such sale of Collateral that has been approved by the DIP Lender. |
| **Carve-Out** | "Carve-Out" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a); (ii) to the extent applicable, all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iii) to the extent allowed at any time, but subject in all respects to the Budget described above, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtor and any Official Committee of Unsecured Creditors at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below); and (iv) after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, all unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtor and any Official Committee of Unsecured Creditors in an aggregate amount not to exceed $150,000 (the amount set forth in this clause (iv), the "Post-Carve Out Trigger Notice Cap"); provided, however, that notwithstanding anything to the contrary herein, the aggregate amount of fees, disbursements, costs and expenses incurred (whether before or after the delivery of any Carve Out Trigger Notice) by professionals or professional firms retained by any Official Committee of Unsecured Creditors that may be included in the Carve-Out shall not exceed $50,000. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Lender to the Debtor and their counsel, the United States Trustee, and lead counsel to any official committee, which notice may be delivered following the occurrence and continuance of an Event of Default, and stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| **Indemnification** | The Debtor shall indemnify and hold each of the DIP Lender and the Prospective Purchaser and their respective shareholders, directors, agents, members, partners, advisors, officers, subsidiaries and affiliates (each, an "Indemnified Person") harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP Facility, this Term Sheet, the 363 Sale Term Sheet, the transactions contemplated thereby or hereby, in connection with responding to subpoenas (third party or otherwise) or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such Indemnified Person is a party thereto, except to the extent resulting from the willful misconduct of such Indemnified Person as determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the DIP Lender or Prospective Purchaser exercising discretionary rights granted under the DIP Facility or as contemplated in the 363 Sale Term Sheet. In all such litigation, or the preparation therefor, the DIP Lender or Prospective Purchaser shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtor agrees to pay promptly the reasonable fees and expenses of such |

| | |
|---|---|
| | counsel. |
| **Other Terms** | **506(c) Waiver.**  All rights to surcharge the Collateral under Section 506(c) of the Bankruptcy Code shall be waived effective upon entry of the Final Order. |
| | **Other Customary Terms.**  Other terms and conditions customary for postpetition financing of this type. |
| | **Binding.**  The terms of any Interim Order and Final Order shall be binding on the Debtor and any successors of the Debtor, including any chapter 7 or 11 trustee. |

*[Signatures to follow on next page]*

**ACKNOWLEDGED AND CONSENTED TO:**

**DIP LENDER:**

**THE CATALYST CAPITAL GROUP INC.**

By: _____

Name: _____

Title: _____


**DEBTOR:**

**SIMPLY WHEELZ LLC
D/B/A ADVANTAGE RENT A CAR**

By: _____

Name: _____

Title: _____


ButlerSnow 18283953v1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| In re: | ) |
| | ) |
| **SIMPLY WHEELZ LLC D/B/A ADVANTAGE** | )     **CASE NO. 13-0332-ee** |
| **RENT-A-CAR** | )     **Chapter 11** |
| | ) |
| **Debtor** | ) |
| | ) |

### NON-BINDING 363 SALE TERM SHEET

This term sheet (this "Term Sheet") sets forth the central terms of a credit bid (the "Credit Bid") to be submitted by an affiliate or designee of The Catalyst Capital Group Inc. (the "Purchaser") . This Term Sheet is non-binding, for discussion purposes only and shall not be construed as a commitment of any kind to enter into the Transaction (as defined below) or any other transaction. Any such Transaction shall, in any event, be subject to completion of final documentation (the "Definitive Agreements") in form and substance satisfactory to Purchaser and Seller, which documentation may contain terms that may be material and may vary from those set forth below.

| 1. | **Transaction Structure** | Pursuant to Sections 363(b), 363(k) and 365 of the Bankruptcy Code, (a) Simply Wheelz LLC d/b/a Advantage Rent A Car ("Seller", the "Company" or the "Debtor")[1] will sell, assign, convey, transfer and deliver to Purchaser the Purchased Assets (as defined below), free and clear of all liens, claims, encumbrances (other than certain specified permitted encumbrances) and successor liabilities and (b) Purchaser will assume the Assumed Liabilities (as defined below) (collectively, the "Transaction"). |
|---|---|---|
| 2. | **DIP Financing** | In support of the Transaction, Purchaser or one of its affiliates shall provide debtor-in-possession financing (the "DIP Financing") to Seller, upon the terms and conditions and subject to documentation acceptable to Purchaser, as described in Exhibit A hereto (the "DIP Facility" and the term sheet attached as Exhibit A, the "DIP Facility Term Sheet"). |
| 3. | **Bankruptcy Court Process** | Simultaneously herewith Seller has commenced (such date, the "Commencement Date") a Chapter 11 case in the United States Bankruptcy Court for the Southern District of Mississippi (the "Bankruptcy Court"), and on or before November 8, 2013, Seller shall file in the Bankruptcy Court a motion to approve the Transaction, which motion shall be in form and substance satisfactory to Purchaser (the "Sale Motion"). The Sale Motion shall seek entry of two orders, each, in form and substance acceptable to Purchaser, in two separate sets of hearings: (a) a preliminary hearing to approve sale procedures and a final hearing to |

---

[1] To the extent (i) any affiliates of Seller are also debtors or (ii) any non-debtor affiliates own assets relating to the Seller's business that Purchaser desires to acquire, then each such debtor affiliate and non-debtor affiliates shall be added as a seller to the Definitive Agreements.

CH\1692401.5

**EXHIBIT**

tabbies "C"

| | | |
|---|---|---|
| | | approve sale procedures, in each case, to be held as soon as possible following the Commencement Date and in no event later than November 19, 2013 and November 22, 2013, respectively (the sale procedures order (in form and substance acceptable to Purchaser) to be entered at the final sale procedures hearing, the "Sale Procedures Order") and (b) a preliminary hearing to approve the sale (the "Preliminary Sale Approval Hearing") and a final hearing to approve the sale (the "Final Sale Approval Hearing") to be held on or before December 10, 2013 and December 17, 2013, respectively (the sale approval order (in form and substance acceptable to Purchaser) to be entered at the Final Sale Approval Hearing, the "Sale Approval Order"). The Sale Procedures Order shall (i) schedule the Preliminary Sale Approval Hearing for a date on or before December 10, 2013 and the Final Sale Approval Hearing for a date on or before December 17, 2013; (ii) schedule the auction (the "Auction") for qualified bids (as described in greater detail below) for all, or substantially all, of the Purchased Assets for at date no later than December 9, 2013; (iii) approve the Bid Protections (as defined below); (iv) establish notice procedures in respect of the sale; (v) provide that any potential bidder submitting a competing bid must include with such bid proof of ability to consummate the Transaction, including financing; and (v) establish a bid deadline of the date that is three business days prior to the date of the auction. |
| 4. | **FTC Consent** | Prior to the earlier of (x) November 15, 2013 and (y) the entry of the Sale Procedures Order, Seller shall have obtained the consent of the U.S. Federal Trade Commission ("FTC") with respect to the Transaction and to Purchaser as an eligible purchaser of the Purchased Assets, such consent to be in form and substance acceptable to Purchaser and Seller. |
| 5. | **Purchase Price** | The purchase price for the Purchased Assets will consist of (i) a Credit Bid equal to the lesser of (x) $46 million and (y) all DIP Obligations outstanding as of the Closing of the Transaction plus (ii) the assumption of the Assumed Liabilities (collectively, the "Purchase Price"). . |
| 6. | **Purchased Assets** | "Purchased Assets" means all right, title and interest in and to all assets, properties, titles, rights and interests of Seller and its affiliates of every kind and nature, including without limitation the Assumed Executory Contracts (as defined below), but in all cases excluding the Excluded Assets (as defined below). |
| 7. | **Excluded Assets** | "Excluded Assets" means (i) rights under contracts of Seller not assumed by Purchaser in connection with the Transaction; (ii) the books and records of Sellers that constitute charters, bylaws, limited liability company agreements, minute books, stock transfer records, and other records related to the corporate governance of Sellers (the "Retained Books and Records"); provided, however, that copies of the Retained Books and Records shall be supplied to the Purchaser upon request; and (iii) any and all rights under the Definitive Agreements, and any rights, Claims, counterclaims, demands and Causes of Action of Seller that relate to the Retained Liabilities; (iv) any rights, Claims, counterclaims, demands and Causes of Action of Seller against The Hertz Corporation or any of its |

| | | |
|---|---|---|
| | | affiliates; (v) any and all avoidance Claims or Causes of Action arising under Chapters 3 and 5 of the Bankruptcy Code other than avoidance Claims or Causes of Action against any employee of the Seller who is hired by the Purchaser, or any counterparty to any assumed contract or lease of the Seller; and (vi) such other assets and rights of Seller as may be later designated as Excluded Assets by Purchaser. |
| 8. | **Assumed Liabilities** | "Assumed Liabilities" means, subject to disclosure by Seller and review by Purchaser, (a) substantially all of the trade liabilities of Seller or created by Seller related to goods or services received by Seller in the ordinary course of business after the Commencement Date and in accordance with the Budget (as defined in the DIP Term Sheet) (the "Budget"); and (b) to the extent accrued by Seller in the ordinary course of business consistent with past practice prior to the Closing, liabilities of Seller for any unpaid payroll, and any untaken sick leave and vacation, in each case, with respect to employees of Seller to the extent such liabilities are entitled to priority treatment under §507(a)(4) of the Bankruptcy Code and incurred in accordance with the Budget. |
| 9. | **Excluded Liabilities** | "Excluded Liabilities" means all liabilities and obligations of Seller of whatever kind or nature other than the Assumed Liabilities. |
| 10. | **Representations and Warranties** | The Definitive Agreements shall contain representations and warranties of Seller and Purchaser customary for a transaction of this type. |
| 11. | **Assumed Executory Contracts** | The Definitive Agreements shall include a schedule of "executory contracts" and "unexpired leases" of Seller (collectively, "Executory Contracts") selected by Purchaser that Seller shall assume and assign to Purchaser (such Executory Contracts, the "Assumed Executory Contracts"). |
| | | At any time during the period commencing on the date of the Definitive Agreements and ending immediately prior to closing, Purchaser may amend the schedule of Assumed Executory Contracts: (i) to add any Executory Contract of Seller not then listed on such schedule, thereby making such Executory Contract an Assumed Executory Contract; or (ii) to remove any Executory Contract from such schedule, thereby making such Executory Contract an Excluded Asset. In addition, if the Purchaser determines after the closing to have the Seller assume and assign to it an Executory Contract not previously listed on the schedule of Assumed Executory Contracts (a "Post-Closing Designated Executory Contract") and if such Designated Executory Contract has not been rejected, then the Seller shall use commercially reasonable efforts to obtain Bankruptcy Court approval for such assumption and assignment, and Purchaser shall pay all cure amounts in connection with such assumption and assignment. |
| | | All Assumed Executory Contracts (other than any Post-Closing Designated Executory Contract) will be assumed and assigned to Purchaser at closing and cure amounts in connection with such assumptions and assignments shall be the responsibility of Purchaser; |

- 3 -

| | | provided that any . |
|---|---|---|
| | | Subject to Purchaser's right to amend the list of Assumed Executory Contracts provided above, Purchaser shall assume all airport concession agreements, leases and similar contracts of Seller relating to facilities for its rental car locations, except for those which Purchaser will set forth in a schedule to the Definitive Agreements (the "<u>Excluded Airport Concession Agreements</u>" and all airport concession agreements, leases and similar contracts of Seller relating to facilities for its rental car locations other than the Excluded Airport Concession Agreements, collectively, the "<u>Assumed Airport Concession Agreements</u>"). |
| 12. | **Non-Assignable Items** | If any contract, arrangement, permit, license, consent or similar asset or right that is intended to be included in the Purchased Assets is determined not to be capable of being assigned (pursuant to Section 365 of the Bankruptcy Code) or transferred (pursuant to Section 363 of the Bankruptcy Code) to Purchaser at the closing without the consent of the third party, then the Definitive Agreements will not constitute an assignment in the absence of such third party consent. Seller will use commercially reasonable efforts, and Purchaser will cooperate with Seller, to obtain any such third party consents. At the direction of Purchaser, Seller will use its reasonable best efforts to provide the benefits of, and enforce for the account of Purchaser the rights of Seller under, such contract, arrangement, permit, license, consent or similar asset or right. If Purchaser is provided such benefits, Purchaser will perform, on behalf of Seller, for the benefit of the third party to such contract, arrangement, permit, license, consent or similar asset or right, the obligations of Seller thereunder, including payment obligations. Notwithstanding the foregoing, the Purchaser shall not be obligated to consummate the Transaction if any of the Assumed Airport Concession Agreements are not assumed and assigned to the Purchaser at closing. |
| 13. | **Covenants** | The Definitive Agreements shall contain, without limitation, the following pre-closing covenants: (a) Purchaser's access to information of Seller, including access to the facilities and books and records of Seller; (b) Seller's operation of the business in the ordinary course; and (c) Purchaser's and Seller's cooperation in making all necessary filings with, and obtaining all necessary approvals and consents from, all governmental agencies and other third parties necessary to consummate the Transaction. |
| 14. | **Conditions to Closing** | The Definitive Agreements shall contain the following conditions to the obligations of Seller and Purchaser to close the Transaction: <br><br> • entry of a Sale Procedures Order and Sale Approval Order by the Bankruptcy Court that are acceptable to Seller and Purchaser and which have become final and non-appealable; and <br> • no law or pending order of a governmental authority that restrains, enjoins or otherwise prohibits the Transaction. <br><br> In addition, the Definitive Agreements shall contain the following |

- 4 -

|    |    | conditions to the obligation of Purchaser to close the Transaction:<br><br>• accuracy in all material respects of Seller's representations and warranties;<br>• compliance in all material respects by Seller with all pre-closing covenants;<br>• there shall be no prohibition of or limitation on the acquisition, ownership or operation by Purchaser or any of its affiliates of the Purchased Assets, or a requirement that Purchaser or any of its affiliates divest or hold separate any of the Purchased Assets or any of the assets of Purchaser or any of its affiliates;<br>• there shall not have been, or reasonably expected to be, a material adverse effect on the business or condition of Seller, the Purchased Assets, or the Assumed Liabilities from and after the Effective Date of the Definitive Agreements;<br>• receipt by Purchaser of consents from third parties (including any other governmental authorities) or permits to permit Purchaser to own and operate the Purchased Assets and Assumed Liabilities from and after the closing in substantially the same manner as operated by Seller (including, without limitation, all consents required to assume and assign the Assumed Airport Concession Agreements); and<br>• Purchaser's satisfaction with the status of the Seller's vehicle fleet and Seller's ability to implement the vehicle fleet plan to which Purchaser has consented, and Purchaser's satisfaction with status of or resolution of any disputes or aspects of the relationship between The Hertz Corporation and its affiliates, on the one hand, and Seller and its affiliates, on the other hand.<br><br>Further, the Definitive Agreements shall contain the following conditions to the obligation of Seller to close the Transaction:<br><br>• accuracy in all material respects of Purchaser's representations and warranties; and<br>• compliance in all materials respects by Purchaser with all pre-closing covenants. |
| 15. | **Termination** | The Definitive Agreements will be terminable as follows:<br><br>• by the mutual written consent of Seller and Purchaser;<br>• by either Seller or Purchaser if consummation of the Transaction is restrained, enjoined or otherwise prohibited by the Bankruptcy Court or any governmental authority;<br>• by either Seller or Purchaser if the closing of the Transaction will not have occurred on or before January 3, 2014 (the "End Date"), or such later date as the parties may agree in writing; provided that the party seeking to terminate the Definitive Agreements under this provision will not have breached in any material respect its obligations under the Definitive Agreements in a manner that has been the principal cause of the failure of the Transaction to close on or before the End Date;<br>• by Purchaser if (i) the Bankruptcy Court has not entered the Sale |

CH\1692401.5

Procedures Order on or before November 15, 2013, (ii) the Auction has not concluded by December 6, 2013, (iii) the Bankruptcy Court has not entered the Sale Approval Order on or before December 13, 2013, or (iv) at any time after entry of the Sale Procedures Order, any of the Bid Protections are reversed, stayed, vacated or otherwise modified;

- by either Seller or Purchaser if the bankruptcy case of Seller is dismissed in whole or in part or converted to Chapter 7 of the Bankruptcy Code;

- by either Seller or Purchaser if the Bankruptcy Court approves the sale, lease or other disposition of all or substantially all of the Purchased Assets to a different purchaser;

- by Purchaser if Seller has breached any of its representations, warranties, covenants or agreements set forth in the Definitive Agreements, which breach gives rise to the failure of a closing condition and is not cured within the earlier of the End Date or the 10th day following receipt of written notice of such breach;

- by Seller if Purchaser has breached any of its representations, warranties, covenants or agreements set forth in the Definitive Agreements, which breach gives rise to the failure of a closing condition and is not cured within the earlier of the End Date or the 10th day following receipt of written notice of such breach; or

- by Purchaser if the DIP Facility has been terminated on account of any Event of Default (as defined in the DIP Term Sheet).

| 16. | Bid Protections | The Definitive Agreements shall provide, and the Sale Procedures Order shall approve, bid protections (the "Bid Protections") for the benefit of Purchaser in the form of a break-up fee equal to $3 million.  The Sales Procedures Order shall further require that the minimum acceptable initial overbid be set at $3,500,000 with subsequent bidding in minimum increments of $500,000. In valuing Purchaser's initial bid as evidenced by this Term Sheet or any subsequent overbid by Purchaser, Seller will give effect to the break-up fee to which Purchaser may be entitled.  The Sale Procedures Order shall grant the break-up fee administrative expense priority under Section 503 of the Bankruptcy Code and a carve-out from the liens of any secured creditor of Seller, such that the break-up fee would be paid prior to any recovery by secured creditors of Seller. |
| | | In order to participate in the Auction, a bidder must satisfy the customary requirements for being a "Qualified Bidder" and its bid must satisfy the customary requirements for being a "Qualified Bid." The Qualified Bidder and Qualified Bid requirements will be set forth in the Sale Procedures Order and shall be acceptable to the Purchaser.  Among other things, a Qualified Bid must (i) offer to purchase the Purchased Assets on terms and conditions that are substantially the same as, or more favorable to the Seller than, the terms and conditions set forth in the Definitive Agreements, (ii) be irrevocable and remain in effect until the earlier of the closing of the bid of the successful bidder and January 3, 2014, (iii) include written evidence of a firm, irrevocable commitment for financing, or other satisfactory evidence of the bidder's financial wherewithal to consummate its bid with no financing contingency whatsoever, (iv) not be |

|  |  | is not conditioned on (x) the outcome of unperformed due diligence by the bidder (and includes an acknowledgement and representation that the bidder has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer) and/or (y) obtaining financing; (v) fully disclose the identity of each entity that will be bidding for the Purchased Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation; (vi) must have a value to the Seller, in its reasonable business judgment, that is greater than or equal to the sum of the value offered under the Definitive Agreements, plus (x) the amount of the break-up fee payable to the Purchaser plus (y) $500,000, (vii) include an acknowledgment and representation that the bidder will assume the Seller's obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Definitive Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing; (vii) include evidence, in form and substance reasonably satisfactory to Seller, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery  and closing of the definitive agreements evidencing its bid; (viii) be accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Seller), certified check or such other form acceptable to the Seller, payable to the order of the Seller (or such other party as the Sellers may determine) in an amount equal to $3 million; (ix) it includes evidence of the bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Seller and assigned to the bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases; and (x) must be submitted by the bid deadline.

The Seller shall deliver copies of any bids deemed to be Qualified Bids to Purchaser at least 48 hours prior to the commencement of the Auction. |
| 17. | **Governing Law** | The Transaction and all matters arising out of or related thereto will be governed by (i) to the extent applicable, the Bankruptcy Code; and (ii) to the extent the Bankruptcy Code is not applicable, the laws of the State of Mississippi. |

CH\1692401.5

| 18. | **Costs and Expenses** | Seller shall bear its own expenses in connection with this Term Sheet and the Transaction. |
|-----|------------------------|---------------------------------------------------------------------------------------------|

*[Signature Page Follows]*

- 8 -

**ACKNOWLEDGED AND CONSENTED TO:**

**PURCHASER - THE CATALYST CAPITAL GROUP INC.**

By: _____

Name: _____

Title: _____

**SELLER - SIMPLY WHEELZ LLC
D/B/A ADVANTAGE RENT A CAR**

By: _____

Name: _____

Title: _____

*[Signature Page to Non-Binding 363 Sale Term Sheet]*

**EXHIBIT**

"D"

Advantage Rent A Car

## DIP Budget

US$ in thousands

| | Week # Ending: | 1 11/9/2013 | 2 11/16/2013 | 3 11/23/2013 | 4 11/30/2013 | 5 12/7/2013 | 6 12/14/2013 | 7 12/21/2013 | 8 12/28/2013 | 9 1/4/2014 | Sale Process Total | Post-Sale Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance (Book) | $ | 1,445 | 97 | 96 | 2,906 | 2,684 | 69 | 1,780 | 94 | 2,977 | 1,445 | 67 | 1,445 |
| **Operating Cash Flow:** | | | | | | | | | | | | | |
| Total Operating Receipts | | 5,730 | 5,661 | 5,661 | 5,661 | 5,128 | 5,373 | 5,373 | 5,373 | 5,968 | 49,928 | - | 49,928 |
| **Hertz Disbursements:** | | | | | | | | | | | | | |
| Hertz Sublease Adequate Protection Payments | | - | - | - | - | (3,391) | - | - | - | (3,391) | (6,782) | | (6,782) |
| Hertz Salvages | | (142) | (142) | (142) | (142) | (136) | (136) | (136) | (136) | (140) | (1,251) | | (1,251) |
| Hertz Facility Lease | | - | - | - | - | (100) | - | - | - | (100) | (200) | | (200) |
| Hertz CFC / Concessions | | - | - | - | - | (400) | - | - | - | (400) | (800) | | (800) |
| Hertz Joint Use | | - | - | - | (200) | - | - | - | (200) | - | (400) | | (400) |
| Total Hertz Disbursements | | (142) | (142) | (142) | (342) | (4,027) | (136) | (136) | (336) | (4,031) | (9,433) | - | (9,433) |
| **Other Operating Disbursements:** | | | | | | | | | | | | | |
| Non-Hertz Sublease Payments | | - | - | - | - | (1,500) | - | - | - | (1,500) | (3,000) | | (3,000) |
| Sales Tax and CFC Payments | | - | (3,518) | - | - | - | - | (3,516) | - | - | (7,034) | | (7,034) |
| Personnel & Temporary Labor | | (600) | (1,500) | (600) | (1,100) | (594) | (1,492) | (592) | (1,092) | (595) | (8,165) | | (8,165) |
| Airport Concessions, Rent & Utilities | | (2,229) | - | (400) | - | (2,236) | - | (660) | (71) | (2,258) | (7,854) | | (7,854) |
| OTA Commissions / Selling / Marketing | | - | (1) | - | (13) | - | (20) | (2,436) | (20) | - | (2,490) | | (2,490) |
| Fuel | | (229) | - | (294) | (294) | (294) | (286) | (283) | (283) | (283) | (2,247) | | (2,247) |
| Insurance | | - | (659) | - | - | - | - | (691) | - | - | (1,349) | | (1,349) |
| P-Cards / Vehicle Damage / Location G&A | | (245) | (445) | (216) | (494) | (315) | (486) | (301) | (486) | (300) | (3,288) | | (3,288) |
| Corporate SG&A and Other | | - | (200) | (200) | (200) | (210) | (200) | (200) | (200) | (200) | (1,610) | | (1,610) |
| Total Operating Disbursements | | (3,303) | (6,321) | (1,710) | (2,101) | (5,149) | (2,486) | (8,678) | (2,153) | (5,136) | (37,037) | | (37,037) |
| Net Operating Cash Flow | | 2,285 | (802) | 3,810 | 3,218 | (4,048) | 2,751 | (3,442) | 2,883 | (3,198) | 3,458 | | 3,458 |
| **Other Disbursements:** | | | | | | | | | | | | | |
| Performance Bonds | | - | (527) | - | (1,440) | - | - | (793) | - | - | (2,760) | | (2,760) |
| Non-Fleet Capex | | - | (44) | - | - | - | (44) | - | - | - | (88) | | (88) |
| Fleet Purchases | | - | - | (1,000) | (2,000) | (4,000) | (996) | - | - | (5,690) | (13,686) | | (13,686) |
| Total Other Disbursements | | - | (571) | (1,000) | (3,440) | (4,000) | (1,040) | (793) | - | (5,690) | (16,533) | | (16,533) |
| **Bankruptcy & Restructuring Costs:** | | | | | | | | | | | | | |
| Deposits | | (7,750) | - | - | - | - | - | - | - | - | (7,750) | 7,750 | - |
| Critical Vendor Payments | | (9,462) | - | - | - | - | - | - | - | - | (9,462) | | (9,462) |
| Key Employee Incentive Plan | | - | - | - | - | - | - | - | - | - | - | (350) | (350) |
| Restructuring Professionals | | (10) | - | - | - | - | - | - | - | - | (10) | (2,765) | (2,775) |
| DIP Interest & Fees | | (1,012) | (28) | - | (267) | - | (52) | - | - | (122) | (1,481) | (260) | (1,742) |
| Final Estate Wind-Down | | - | - | - | - | - | - | - | - | - | - | (750) | (750) |
| Other / Contingency | | - | | | | | | | | | | | |
| Total Bankruptcy & Restructuring Costs | | (18,234) | (28) | - | (267) | - | (52) | - | - | (122) | (18,703) | 3,625 | (15,079) |
| Net Cash Flow Before DIP | | (15,949) | (1,401) | 2,810 | (222) | (8,315) | 1,711 | (4,286) | 2,883 | (9,010) | (31,779) | 3,625 | (28,154) |
| **DIP Borrowing / (Repayment)** | $ | 14,600 | 1,400 | - | - | 5,700 | - | 2,600 | - | 6,100 | 30,400 | (3,691) | 26,709 |
| Net Cash Inflow / (Outflow) | | (1,349) | (1) | 2,810 | (222) | (2,615) | 1,711 | (1,686) | 2,883 | (2,910) | (1,379) | (66) | (1,445) |
| Ending Cash Balance (Book) | $ | 97 | 96 | 2,906 | 2,684 | 69 | 1,780 | 94 | 2,977 | 67 | 66 | 1 | - |
| **Summary Liquidity Forecast** | | | | | | | | | | | | | |
| **DIP Facility** | | | | | | | | | | | | | |
| Beginning Balance | $ | - | 14,600 | 16,000 | 16,000 | 16,000 | 21,700 | 21,700 | 24,300 | 24,300 | - | 30,400 | - |
| Net Borrowing / (Repayment) | | 14,600 | 1,400 | - | - | 5,700 | - | 2,600 | - | 6,100 | 30,400 | (3,691) | 26,709 |
| Ending Balance | | 14,600 | 16,000 | 16,000 | 16,000 | 21,700 | 21,700 | 24,300 | 24,300 | 30,400 | 30,400 | 26,709 | 26,709 |
| DIP Commitment | | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 |
| Total Availability | | 21,400 | 20,000 | 20,000 | 20,000 | 14,300 | 14,300 | 11,700 | 11,700 | 5,600 | 5,600 | 9,291 | 9,291 |
| **Total Liquidity (Book Cash + DIP Availability)** | $ | 21,497 | 20,096 | 22,906 | 22,684 | 14,369 | 16,080 | 11,794 | 14,677 | 5,667 | 5,666 | 9,292 | 9,291 |